## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CARMINA R. COMPARELLI,
FREDDY E. LOPEZ COMPARELLI,
LORYELENA DELGADO COMPARELLI,
and JULIO C. DELGADO COMPARELLI.

Plaintiffs,                              CASE NO.:

-against-

REPÚBLICA BOLIVARIANA DE VENEZUELA,
a sovereign nation, and PETROQUÍMICA DE
VENEZUELA, S.A., an agency or instrumentality
of the Bolivarian Republic of Venezuela.

Defendants.
_____/

## COMPLAINT FOR CLAIMS
## PURSUANT TO 28 U.S.C. § 1350

Plaintiffs, Carmina R. Comparelli ("C. Comparelli"), Freddy E. Lopez Comparelli

("F. Comparelli"), Loryelena Delgado Comparelli ("L. Comparelli"), and Julio C.

Delgado Comparelli ("J. Comparelli") (collectively, "Plaintiffs") sues defendants

República Bolivariana de Venezuela (the "Bolivarian Republic of Venezuela",

"Venezuela", the "Venezuelan Government", or "Government of Venezuela") and

Petroquímica de Venezuela, S.A. ("PEQUIVEN") (collectively, "Defendants"), and

alleges as follows:

## THE PARTIES

1.      Plaintiff, Carmina R. Comparelli, is an individual over the age of 18 and otherwise *sui juris*.  At all times material to expropriation alleged in this Complaint, Carmina R. Comparelli was, and continues to be, an Italian citizen.

2.      Plaintiff, Freddy E. Lopez Comparelli, is an individual over the age of 18 and otherwise *sui juris*.  At all times material to expropriation alleged in this Complaint, Freddy E. Lopez Comparelli was, and continues to be, an Italian citizen.

3.      Plaintiff, Loryelena Delgado Comparelli, is an individual over the age of 18 and otherwise *sui juris*.  At all times material to expropriation alleged in this Complaint, Loryelena Delgado Comparelli was, and continues to be, an Italian citizen.

4.      Plaintiff, Julio C. Delgado Comparelli, is an individual over the age of 18 and otherwise *sui juris*.  At all times material to expropriation alleged in this Complaint, Julio C. Delgado Comparelli was, and continues to be, an Italian citizen.

5.      Defendant, the Bolivarian Republic of Venezuela, is a "foreign state" within the meaning of 28 U.S.C. § 1603(a) (which term "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state").

6.      Defendant, Petroquímica de Venezuela, S.A., is an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603(b) (which includes any entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of

2

whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country").

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1330(a) as Venezuela is not entitled to immunity pursuant to 28 U.S.C. § 1604, or under any applicable international agreement.

8.      This Court has jurisdiction over PEQUIVEN pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

9.      This Court further has jurisdiction over Venezuela and PEQUIVEN pursuant to 28 U.S.C. § 1605(a)(3), as, in part, PEQUIVEN, as more fully detailed below, owns or operates the properties identified as the subject matter of this Complaint in furtherance of an illicit expropriation in disavowance of public interest or public utility and without the payment of any compensation.

10.     This cause is a civil action by Plaintiffs, who are Italian citizens, for rights in property taken in violation of international law.

11.     PEQUIVEN is a foreign business entity duly organized and existing pursuant to the laws of Venezuela.  PEQUIVEN is a Venezuelan state petrochemical company engaged in the domestic production and sale of petrochemical products,

3

including fertilizers, industrial chemical products, olefins, and plastic resins.  Pursuant

to Article 6[1] of the Venezuelan Organic Law for the Development of Petrochemical

Activities of 2009, the Government of Venezuela holds all shares of PEQUIVEN or any

successor entity created expressly for the operation of the petrochemical industry in

Venezuela.    *See* **Exhibit 1**, Venezuelan Organic Law for the Development of

Petrochemical Activities of 2009 with English translation.  PEQUIVEN is under the

direct supervision of the Venezuelan Ministry of Popular Power for Petroleum and

Mining.

12.    PEQUIVEN and its subsidiaries, including, but not limited to,

International Petrochemical Sales, Ltd. ("IPSL")[2], engage in commercial activity in the

United States as provided in 28 U.S.C. § 1605(a)(3) as, in part, PEQUIVEN exports

petrochemical products from Venezuela to the various ports in the United States

including, but not limited to, (i) methanol; (ii) anhydrous ammonia, (iii) methyl alcohol;

and (iv) dripoleno as set forth in a sampling of bills of lading attached hereto as

---

[1] Article 6 of the Venezuelan Organic Law for the Development of Petrochemical Activities of 2009 provides: "[f]or reasons of economic sovereignty, policy and national strategy, the State will hold all shares of Petroquímica de Venezuela, S.A. or any successor entity created expressley for the operation of the petrochemical industry.

[2] IPSL is a subsidiary of PEQUIVEN organized and existing purusant to the laws of Tortola in the British Virgin Islands.  IPSL carries on the business of PEQUIVEN rather than its own because it is the commercial arm of PEQUIVEN in charge of international sales of fertilizer products in bulk.

**Composite Exhibit 2**.  PEQUIVEN has availed itself of the United States District Courts in furtherance of its commercial activities in the United States.

13.     PEQUIVEN, and its subsidiaries, additionally engage in commercial activities in the United States and in the Southern District of Florida by:

(a)     marketing and selling their products in South Florida;

(b)     maintaining bank account(s) with financial institutions located in Miami-Dade County;

(c)     exporting and importing products to, from, and through the port of Miami;

(d)     participating in 2009 in the capacity of presenter in a seminar held in Miami Beach, Florida entitled "The Latin American Petrochemical Revolution: Opportunities and Challenges for the Region's Ground-Breaking Petrochemical Infrastructure Development Projects" organized by the International Law Section of the American Bar Association;[3]

(e)     participating in 2011 in the capacity of presenter in a seminar held in Miami, Florida entitled "A borrower's perspective: Has financing in the oil and gas sector weathered the storm better than most?" at the 7th Annual Latin America Syndicated Loans Conference organized by Euromoney Seminars;

(f)     engaging Miami-based attorneys and law firms in furtherance of their commercial activities, for example, in connection with (i) the structuring of joint ventures with foreign companies for the development of a petrochemical complex in Venezuela and (ii) to restructure bonds issued by its subsidiaries including, but not limited to, FertiNitro;

---

[3] This particular presentation solicited private investors to participate in Venezuela's petrochemical sector as reported by Latin Lawyer. *See* http://latinlawyer.com/news/article/27196/private-companies-invest-says-pequiven/ (last visited November 19, 2014).

5

(g)     maintaining the website www.pequiven.com which contains extensive information that is accessible by potential customers in the United States and the Southern District of Florida, in particular, where PEQUIVEN and its subsidiaries transact substantial commercial activity; and

(h)     attending meetings in Miami, Florida in furtherance of their commercial activities, including for example, a 2005 meeting of PEQUIVEN's representatives with representatives of Exxon Mobil Corp. to negotiate a $3 billion joint venture project to build a petrochemicals complex in Venezuela.

14.     Venezuela and PEQUIVEN are subject to service of process pursuant to 28 U.S.C. § 1608.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), and 28 U.S.C. § 1391(f)(3).

16.     Venezuela and/or PEQUIVEN own or operate all properties identified in this Complaint.

17.     Plaintiffs have suffered damages as a result of the allegations asserted in this Complaint and has brought this action for damages in excess of USD$ 70,000,000.00.

18.     All conditions precedent to the bringing of this action either have occurred, have been performed, or otherwise have been waived.

## GENERAL ALLEGATIONS

## THE POLITICAL BACKDROP: VENEZUELA'S "SOCIALIST REVOLUTION" AND THE REMOVAL OF INDEPENDENCE AND AUTONOMY FROM THE JUDICIAL BRANCH

19.     Since the late Hugo Rafael Chávez Frías ("President Chávez" or "Hugo Chávez") assumed the Office of the President of the then-Republic of Venezuela (now the Bolivarian Republic of Venezuela) on February 2, 1999, Venezuela has been ruled by a corrupt and single-party totalitarian government under the guise of a state committed to the rule of law.[4]  The late President Chávez disavowance of the rule of law in favor of totalitarian rule has been amply chronicled and documented.  Its roots are both deep and long-standing.   On February 4, 1992, then-Lt. Col. Hugo Chávez led a failed military coup against the democratically elected President of the Republic of Venezuela, Carlos Andrés Pérez.  The coup attempt failed, and Hugo Chávez served prison time for approximately two years until receiving a presidential pardon from President Rafael Caldera in 1994.  President Chávez treated, and its successor President Nicolás Maduro ("President Maduro" or "Nicolás Maduro") treats the February 4 anniversary of the failed coup attempt as a celebratory national holiday, thus underscoring Hugo Chávez's

---

[4] The U.S. Department of State Human Rights Practices for 2013 Report for Venezuela states in relevant part that: "Venezuela is formally a multi-party constitutional republic, but in recent years, political power has been concentrated in a single party with an increasingly authoritarian executive exercising significant control over the legislative, judicial, human rights ombudsman, and electoral branches of government." *See* **Exhibit 3** at pg. 2.

vision of the primacy of totalitarian military rule over a civilian and democratically elected government.

20.     During his government, President Chávez engaged in systematic and organized political persecution.  President Maduro has also engaged in systematic and organized political persecution since he came into power upon the announcement of President Chávez's death on March 5, 2013.  President Chávez died before completing his six-year term.  On March 8, 2013, the Venezuelan Supreme Court ("STJ", "Supreme Court", or "Superior Tribunal of Justice") swore Nicolás Maduro as acting president and stated Maduro would not need to relinquish his position as acting president to run in the upcoming election.  *See* **Exhibit 3** at pg. 27.  Government critics and scholars claimed the STJ's decision was unconstitutional because the constitution prohibits a sitting vice president, minister, governor, or mayor from running for president while serving in one of those designated positions.  *Id*.  Despite these objections, the National Electoral Council ("CNE") called a special election for April 14, 2014.  *Id.*

21.     On April 14, 2014, CNE President Tibisay Lucena announced that acting president and United Socialist Party of Venezuela ("PSUV") candidate Nicolás Maduro had received 50.66 percent of the votes and opposition candidate Henrique Capriles Radonski had received 49.07 percent.  *Id.*  Lucena announced that the results were "irreversible."  *Id.*  Capriles stated in a press conference that he would not recognize the electoral results and demanded that the CNE conduct a full audit of the results.  *Id.*

8

After the CNE refused to audit all electoral instruments involved in the electoral process, the Capriles campaign submitted three (3) petitions to the STJ requesting that it annul the April 14 elections. *Id.* Capriles' petitions argued that before, during, and after the elections, numerous government abuses of power and other irregularities affected the election results. *Id.* Abuses cited included improper assisted voting, voter intimidation, proselytizing close to the voting centers, restricting voting-center witnesses, government officials campaigning while in their official capacities, and the government candidate's misuse of public resources during the official campaign. *Id.* The Capriles campaign stated it received complaints of election-day irregularities in 3,389 voting centers, affecting approximately eight million (8,000,000) voters. *Id.* On August 7, 2014, the STJ announced its unanimous decision to dismiss all challenges to the presidential election, including those of Capriles. *Id.* The STJ also dismissed seven other petitions filed by various NGOs and private citizens contesting the April 14 election. *Id.*

22.     At the time of the expropriation that is the subject of this Complaint, President Chávez was the acting President of Venezuela. Since the beginning of his regime, until the present, opposition figures and their families often are marginalized with respect to the economic sector, persecuted, and incarcerated. Their businesses are "intervened" pursuant to fraudulent legal pretenses and their assets confiscated and expropriated outright within the framework of state-controlled partisan legal

9

proceedings where judicial authority and juridical discretion has been completely wrested from judges at all levels of the judiciary.  Political opponents, perceived critics of the Government of Venezuela, and individuals owning successful businesses are not accorded any meaningful due process and are typically subjected to mock legal proceedings.

23.     Because perceived Chávez and Maduro detractors and non-sympathizers, as well as successful entrepreneurs, are at best affirmatively disadvantaged in contemporary Venezuela society and at worst, and in most instances, persecuted and denied even the most fundamental of freedoms, the Venezuelan Government under the rule of the late Hugo Chávez and now President Maduro have in effect fashioned an apartheid society based on political ideology or affiliation and not race as its central organizing principle of discrimination.  Government jobs, educational advancement, commercial transactions, the conveyance and acquisition of property (real and personal), social advancement, and even the right to a passport are premised on meeting a very stringent, inflexible, and monolithic political criterion: unquestioned and unbridled support for the late Hugo Chávez's and President Maduro's regime.

24.     Illustrative of the new Venezuelan apartheid is the infamous Tascón List (the "*Lista Tascón*").  This list of names contains the identity of all 2.4 million Venezuelan citizens who signed a petition for the late President Chávez's recall pursuant to a constitutional referendum.  The list was illicitly secured by the late

10

Venezuelan Congressman Luis Tascón, who published it on the internet, and consequently later was adopted by key ministries as a criterion for (i) issuance of government documents (including passports), (ii) denial of work applications, (iii) termination of government employment, (iv) entitlement to higher education, (v) standing for participation in government contracts, including bid solicitations, among other activities that directly and indirectly touch and concern the Government of Venezuela and its exercise of sovereignty through various government ministries.

25.    Today, as of the filing of this complaint, the Tascón List remains a bulwark criterion and predicate for any activity administered by or regulated pursuant to the Venezuelan Government.  The late President Chávez and minister-level officials have publicly characterized the 2.4 million signatories as "terrorists" who sought to overthrow and destabilize the Government.

26.    During his term, President Chávez weakened all of the country's institutions under the theory that all national institutions, instrumentalities and government agencies must subordinate their roles to, and exercise them according to the principles of Hugo Chávez's "Socialist Bolivarian Revolution," which heralds the advent of a "new Socialism for the Twenty-First Century."   Consequently, bipartisanship, let alone multipartisanship, has been functionally elided from all branches of government, instrumentalities of the sovereign, and government agencies. Ideological subordination preempts all expressions of private and public freedom under

the rule of the late President Chávez and, subsequently, under the rule of President Maduro.

27.     As part of President Chávez's consolidation of power and execution of a totalitarian rule under the false mantle of a democratic regime, and presumptively pursuant to his own formulation of a "Socialist Revolution", he advocated for a severance from all "principles of the past", including altering the name of the country to the "Bolivarian Republic of Venezuela" and an embracing of a single ideological social and political paradigm defined at his whim and completely subordinated to the perpetuation of his status as President of Venezuela until his death.  Through the execution of this program to perpetuate himself in power based upon the ideology of his own brand of "Socialist Revolution", and with the trappings of legality, President Chávez completely eliminated any independence of the judiciary from the executive branch of government.  The examples are particularly illustrative.

28.     First, on October 7, 2011, the United Nations Human Rights Council ("UNHCR") held the Universal Periodic Review session for Venezuela, to discuss the situation of human rights in the country.  On October 11, 2011, the UNHCR submitted to the Venezuelan Government a 148-point document suggesting human rights recommendations, including political and judicial reform (among others).  Seventeen (17) of these recommendations directly and explicitly called for the independence of the Venezuelan Judiciary from the Executive Branch as well as for former's impartiality so

12

as to vest its officers and its judges with judicial discretion in the administration of justice. The United Nations' call for an independent judiciary fell on deaf ears as evidenced on October 11, when the Venezuelan Government rejected all 17 recommendations. In overtly and without reservation denying the propositions exhorting judicial reform, the Venezuelan Government made plain that the wholesale want of independence and impartiality of the Venezuelan Judiciary now has been converted into a matter of public and political state policy.

29.     Second, on December 10, 2009, a then-First Instance Judge of the 31st Judicial Circuit, Criminal Division, in and for the Metropolitan Area of Caracas, María Lourdes Afiuni, issued an order releasing on bond pending a merits trial a prominent Venezuelan banker who had been incarcerated and deprived of all property based upon corruption charges that in fact were fraudulent (the criminal defendant actually was incarcerated based upon his allegedly critical views of the Venezuelan Government under President Chávez.). Judge Afiuni issued the temporary release order in furtherance of the application of fundamental due process rights. Within hours of issuing the order releasing on bond a suspected Chávez detractor, Judge Afiuni was stripped of her functions and title as a member of the judiciary and incarcerated without even a preliminary hearing on December 17, 2009. Judge Afiuni was punished for following the United Nations' guidance when she released the prominent Venezuelan banker who had been detained longer than the time allowed under

13

Venezuelan law.[5]  News reports suggest that she now is being "tried" on charges of corruption.  Judge Afiuni was held in prison or under house a rest for three years and a half when she was ultimately released on June 14, 2013.  *See* http://www.nytimes.com/2013/06/15/world/americas/court-in-venezuela-orders-release-of-a-judge-once-scorned-and-jailed-by-chavez.html (last visited on November 19, 2014).  The trial, however, has been inordinately fragmented and delayed.  Moreover, the public has been foreclosed from viewing or otherwise participating in the proceedings.

30.      The judiciary has been relegated to the role of a second tier rubber stamp.  Its primary function is to vest with legal formalism the arbitrary, capricious and discriminatory acts of the Venezuelan Government.   No perceived detractor of President Chávez or President Maduro or non-sympathizer has ever prevailed in any civil or criminal contention against the State, its instrumentalities, or its government agencies.   Courts are charged with engrafting the appearance of legitimacy onto illegitimate acts that are lacking in due process, fundamental fairness, and in contravention of the most longstanding and time-honored principles shared by the community of civilized nations.

31.      Indeed, in a most remarkable interview, Isaías Rodríguez, former Attorney General of Venezuela and now the current acting Venezuelan Ambassador to

_____

[5] The banker had been held in pre-trial detention for three (3) years, although Venezuelan law prescribes a two (2) year maximum.

Italy, candidly conceded that  "some Venezuelan tribunals are not reliable."  An admission from an acting high-level member of the Chávez regime, who has previously served as Vice-President and Attorney General of the Republic of Venezuela, that the judiciary in some sectors is not reliable truly constitutes an extraordinary indicium of the unavailing status of the judiciary as an independent and impartial institution in Venezuela.

32.    More telling are the explosive confessions of Eladio Aponte Aponte, ("Justice Aponte") a former Venezuelan Supreme Court Justice who was also the Chief Justice of the Criminal Appeals Chamber of the Supreme Court.  Justice Aponte admitted that he received direct instructions from the late President Chávez to impose a thirty (30) year old prison sentence on nine (9) former members of the metropolitan police force without any evidence to establish their guilt.  Moreover, Justice Aponte admitted that he affirmed the conviction without even reading the appellants' brief to the Supreme Court because the late President Chávez told him "to close this matter right away without any further delay."  A copy of a letter authored by Justice Aponte outlining his role in the criminal proceeding at the direction of the late President Chávez is attached hereto as **Exhibit 4**.[6]  Justice Aponte has also made statements to U.S. reporters that in Venezuela "justice is a ball of putty because it can be molded for

---

[6] An English Translation of **Exhibit 4** will be filed with the Court at a subsequent time.

or against" and that in his opinion there is no separation of power in Venezuela.  *See,*

*e.g.*, http://online.wsj.com/articles/SB10001424052702303513404577354320555212742 (last

visited November 19, 2014).

33.     The confessions and admissions of Justice Aponte are extremely relevant

to the claims of expropriation alleged in this Complaint because, as set out in more

detail below, Justice Aponte was one of the Supreme Court's justices that issued an

order affirming a lower's court order (i) issuing a warrant for the arrest of Plaintiffs and

(ii) seeking the extradition of two of the plaintiffs, F. Comparelli and L. Comparelli from

Costa Rica.   Justice Aponte played a key role in the very same bogus criminal

proceeding that was filed against Plaintiffs for the sole purpose of expropriating their

property in violation of Venezuelan and international law.

34.     The lack of an independent judiciary in Venezuela has been noted by the

U.S. Department of State which in its 2013 Human Rights Country Report for Venezuela

reported the following:

> While the constitution provides for an independent judiciary, there was
> significant evidence that the judiciary lacked independence.  There were credible
> allegations of corruption and political influence throughout the judiciary.
> According to reports, more than 60 percent of all judges had provisional
> appointments.  [STJ] justices, elected by the National Assembly, sat on the [STJ's]
> Judicial Committee responsible for hiring and firing temporary judges, which it
> did without cause or explanation.  Provisional and temporary judges, who
> legally have the same rights and authorities as permanent judges, allegedly were
> subject to political influence from the Ministry of Interior, Justice, and Peace and
> the prosecutor general.  On June 12, the [STJ] appointed one of late president
> Hugo Chávez's brothers, Argenis Chávez Frías, as director of the Executive

16

Office of the Judiciary (DEM).  The DEM's responsibilities are administration management and oversight of funding and human resources of the judiciary branch.  NGOs criticized the appointment of Argenis Chávez as a further threat to the autonomy of the justice system.  An engineer by trade, Argenis Chávez had no prior experience in the justice system.  PROVEA reported that in 2012 the [STJ] rejected all cases publicly reported against the main organs of government (the presidency, National Assembly, and Prosecutor General's Office).  Only 7.4 percent of cases submitted to the [STJ] in 2012 against public institutions were accepted, and they were primarily against the CNE and comptroller general.

*See* **Exhibit 3** at pg. 15.

35.     Most impartial NGOs and judicial watchdogs charged with monitoring the independence and impartiality of judicial systems globally overwhelmingly condemn Venezuela's partisan and corrupt judiciary as but an extension of the late President Chávez, and currently of President Maduro, charged with the implementation of the President's political initiatives and efforts at political self-perpetuation to the detriment of the equitable administration of justice.  For example, the July 25, 2014 Joint Submission of the International Commission of Jurists and the International Bar Association's Human Rights Institute to the 112th Session of the UN Human Rights Committee regarding the Bolivarian Republic of Venezuela's compliance with the International Covenant on Civil and Political Rights made the following findings regarding the independence of Venezuelan judges:

- The adoption of the Organic Law of the Supreme Tribunal of Justice in 2004, supposedly concluded the reform process of the justice system in Venezuela; in reality however, actual practices for the appointment and removal of judges continue not to comply with national legislation or international standards on the independence of the judiciary.

17

- In December 1999, the Venezuelan legislature adopted a Decree that required all judicial posts to be open to a competitive selection process. This was interpreted to mean that all judges then in office were automatically dismissed and forced to reapply.  At the same time, the evaluation of applications that subsequently took place was conducted without regard to the evaluation procedures specified by the Norms for Evaluation and Public Competitions for the Admission and Permanence in the Judiciary, enacted in 2000.

- Public tenders for judicial posts were held only during the period from 2000 to 2003, resulting in the appointment of 200 permanent judges.  Since 2003, no public tender has taken place for the appointment and promotion of judges in Venezuela.  As a result, only some 20% of judges currently in office have guaranteed tenure.  The remaining 80% of judges appointed to provisional (52%), temporary (26%), or other offices (2%), do not have security of tenure and can be removed at will by the Judicial Commission of the Supreme Tribunal of Justice (STJ).

- The lack of tenure, as well as the arbitrary removal of judges without following prescribed and fair procedures, adversely affects the impartiality and independence of judges.   Indeed, in a 2009 report on Venezuela, the Inter-American Commission of Human Rights found that '[i]n some cases, judges were removed almost immediately after adopting judicial decisions in cases with a major political impact.'

- Security of tenure is a required guarantee for judges to decide cases without unwarranted interference.  The lack of guaranteed tenure for around 80% of Venezuelan judges, and the risk of discretionary dismissal of judges without any disciplinary proceeding (let alone one that is fair, impartial, an independent and based solely on reasons of serious misconduct or incapacity) impedes the right to access an effective remedy, as per Article 2, paragraph 3, and the right to a fair trial according to Article 14.

- The ICJ and IBAHRI consider that the treatment of Judge María Lourdes Afiuni is emblematic of the lack of respect for judicial independence in Venezuela.

- The *Afiuni* case has created an atmosphere of fear amongst judges, known as the 'Afiuni effect'.  Prior to the case, the IBAHRI found that Venezuelan judges were fearful of disciplinary proceedings or dismissal if they returned decisions unpopular with the executive.  As a result of the *Afiuni* case, in particular the multiple violations of the Covenant that have occurred throughout the process and the above-mentioned statement that her case should be considered exemplary, Venezuelan judges are now fearful of criminal proceedings and/or losing their liberty.  This has caused significant damage to judicial independence in the country and as reported by the IBAHRI following its 2011 visit to Caracas, 'Nobody wants to be the next Afiuni'.

*See* **Exhibit 5** at pgs. 4 and 6-8.

36.     In addition, in July 2012, Human Rights Watch issued a Report entitled

*Tightening the Grip – Concentration and Abuse of Power in Chávez's Venezuela* which made

the following findings about the Venezuelan Judiciary:

- A *Decade under Chávez* documented how President Chávez and his supporters in the National Assembly . . . carr[ied] out a political takeover of the judiciary in 2004, expanding the Supreme Court from 20 to 32 members and filling the new seats with government supporters.

- In September 2010, President Chávez's supporters in the National Assembly moved to extend this control.  Five days after the legislative elections –in which the pro- Chávez majority in the National Assembly was reduced from close to 100 percent to approximately 60 percent of the seats –they modified a key article of the 2004 court-packing law to accelerate the process for naming new justices.  While the original article granted individuals "at least" 30 days to present nominations, the revised version states that they now have "no more than" 30 days. (The legislators claimed they were merely correcting "errors" in the text of a reformed version of the law that had been published earlier that year.)

- With the new rules in place, Chávez's supporters were able to appoint their allies to the Supreme Court before the new Congress was installed. In December 2010, they selected nine new justices, including several

former legislators from Chávez's political party, former high-level government officials, and former ambassadors appointed by the Chávez administration.  (To create new vacancies, the Supreme Court also gave several justices authorization to retire before the conclusion of their constitutional 12-year terms.).

- The political control over the Supreme Court translates directly into control over lower courts as well, as the Supreme Court effectively controls the appointment and removal of lower court judges.  Since 2000, Venezuela's Judicial Commission –currently made up of six justices from the packed Supreme Court –has used its discretionary powers to appoint and remove hundreds of lower court provisional or temporary judges through mechanisms that lack basic due process safeguards.  (Moreover, even though the 1999 constitution mandated the creation of disciplinary tribunals to oversee the work of permanent judges, the Supreme Court exercised such disciplinary powers for over a decade, until the new National Assembly appointed judges to the disciplinary tribunals in 2011.)

- The Judicial Commission has granted stability of tenure to hundreds of provisional and temporary judges.  In theory, this reduction in the number of provisional and temporary judgeships is a positive development.  However, these new positions were not won through open competitions, as required by the Venezuelan constitution, but rather through promotions of provisional and temporary judges who had been appointed at the full discretion of the Judicial Commission.

- Since the political takeover of the judiciary in 2004, the Supreme Court and lower courts have repeatedly failed to fulfill their role as checks on arbitrary state action and guarantors of basic rights.

- In recent years, justices on the packed Supreme Court have openly rejected the notion of the judiciary as an independent branch of government.  Instead of serving as a check on arbitrary state action, they have espoused the view that the role of the country's courts is to support the political agenda of President Chávez.

- For example, at the public ceremony initiating judicial activities for 2011, the keynote speaker, Justice Fernando Torre Alba, declared that the judiciary has the duty to participate in the effective implementation of the

government's public policy to develop "a deliberate and planned action to carry out a Bolivarian and democratic socialism" and that the courts "must severely . . . sanction behaviors or correct judicial cases that undermine the construction of [this] Socialism.

- Later that year, Supreme Court President Luisa Estella Morales declared publicly that President Chávez's "direction, inspiration, and conception of the Republic is what constitutionally inspires . . . our activities." Addressing the president –whom she referred to as "our leader" –she said: "Here are all your institutions, and we are firmly moving forward with the responsibilities that you have given us, which we will never betray, not now, not ever."

- More recently, in May 2012, while addressing newly appointed judges at their swearing-in ceremony, the Supreme Court president exhorted them to understand their role as adjudicators in terms of "our revolutionary project and of the change that is taking place in Venezuela today." (This view of the judiciary's role has not been limited to the Supreme Court. [T]he provisional judge in charge of the case against Judge María Lourdes Afiuni publicly declared his loyalty to President Chávez on the website of the president's political party.  "I give my life for the Revolution," he wrote, "I would never betray this process and much less my Commander.")

- The rejection of the principle of separation of powers has been incorporated into case law as well.  In a July 2009 ruling, the Supreme Court dismissed the "so-called division, distinction or separation of powers" as "the instrument of a liberal doctrine" established to "ensure that the State remained limited to the protection of individualist interests of the ruling class."  The court held that this principle should not be understood to necessarily require a "homogeneous, exclusive, or excluding distribution . . . of tasks [and] powers" amongst branches of government.

- The Supreme Court has repeatedly ruled that the Venezuelan government is not obliged to implement binding decisions of the region's most authoritative human rights body, the Inter-American Convention of Human Rights.

21

- In December 2008, for example, the Supreme Court rejected a binding judgment in which the Inter-American Court had ordered Venezuela to reinstate four judges who had been arbitrarily removed from their positions and modify the existing mechanisms for appointing and removing judges.  The Inter-American Court had found that the removals and existing mechanisms undermined judicial independence in the country.  But the Supreme Court dismissed the Inter-American Court's ruling as "inadmissible" on the grounds that it "violate[d] the Venezuela state's sovereignty."

- The Inter-American Court has previously advised that basic rights should only be limited by a law issued by a legislative branch as opposed to one imposed through decree by the head of state.  Yet, in December 2010, the National Assembly authorized President Chávez to unilaterally establish crimes as part of an "enabling law" that granted him broad powers to legislate by decree for 18 months on a wide variety of issues during this period.

- The Supreme Court has repeatedly upheld case law stating that provisional and temporary judges may be removed from office at the sole discretion of the Judicial Commission of the Supreme Court, despite the fact that this undermines judicial independence.

- For example, in the case of Yolanda del Carmen Vivas Guerrero, whose appointment as provisional judge in the state of Mérida was revoked in June 2005, the court ruled that, while tenured judges can only be removed or sanctioned after receiving an oral public hearing with full due process guarantees, provisional judges can be summarily fired at the discretion of the Judicial Commission.  This decision was cited as supporting precedent in subsequent rulings.

- One judge told Human Rights Watch that, since Judge Afiuni was detained, judges have felt "more pressure to resolve in favor of the government," and that those unwilling to succumb to the pressure routinely recuse themselves from politically sensitive cases.  Another said that judges get phone calls from higher court judges "on a daily basis" telling them how to decide cases, and everyone is "very scared to adopt proper legal decisions" because they know "what the consequences will be" if the Chávez government takes issue with their rulings.  A third judge

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

told Human Rights Watch that the majority of judges refuse to rule against "what they perceive to be the government interest," even if no government official has commented on the case.

- According to Judge Afiuni herself, many judges have told her privately that "they do not have an alternative to obeying the government's orders" because they now fear that if they do not, they will be imprisoned.  When she was detained in prison, some inmates told her that the judges in charge of their cases had said to them that they could not let them go, even if there was evidence in their favor, because "they would go to jail like Afiuni."

*See* **Exhibit 6** at pgs. 16-23, 35-36 and 48.

37.     Moreover, the situation of judiciary in Venezuela from 1999 to 2012, and in particular on the situation of the independence and autonomy of Venezuela's judges was addressed in the legal opinion submitted to this Court by Allan R. Brewer-Carías ("Mr. Brewer-Carías") in the case styled *Nelson J. Mezerhane v. Republica Bolivariana de Venezuela, et. al.*, Case No. 1:11-cv-23983-MGC.  The legal opinion of Mr. Brewer-Carías is attached hereto as **Exhibit 7**.   The legal opinion of Mr. Brewer-Carías contains an appendix with the transcript of Justice Aponte's confessions to Verioska Velasco, a Miami reporter on April 18, 2012.  *Id.* at pgs. 52- 61.

38.     The most salient point of the interview is that when responding to a question regarding the autonomy and independence of the judicial branch, Justice Aponte stated that "*it is a fallacy*" and he added:  "[*a*]*nd I am going to tell you why.  Every weekend, usually Friday mornings, there is a meeting at the office of the Executive Vice President of the nation, where the Vice President, who is the one who handles justice in*

23

*Venezuela, meets with the Presiding Judge of the Supreme Court, with the Attorney General of the Republic, with the President of the National Assembly, with the Prosecutor General of the Republic, with the Comptroller General of the Republic, and at times one of the chiefs of police. That is where the orders on justice come from.  That is, the conductor lines of justice in Venezuela come from there.*"  *Id.* at 60.

39.     Justice Aponte then confirmed that he attended several of the afore-mentioned meetings and when asked whether there is still separation of powers in Venezuela, he candidly admitted: "*I believe that there is not so much independence*".  *Id.* Lastly, when the journalist asked what was discussed in the afore-mentioned meetings, Justice Aponte stated: "*[w]ell, about what cases are pending, what is going to be done.  That is, orders were given according to the political scene.*"  *Id.*

40.     In short, the fact that the Venezuelan judicial branch lacks autonomy, independence, and serves as rubber stamp to carry out the decisions of the legislative and executive branches of the Government of Venezuela is an open and notorious fact that has been already been amply reported as set out above by several governmental and non-governmental organizations including the U.S. Department of State, the Inter-American Commission of Human Rights, the International Jurist Commission, the International Bar Association, and Human Rights Watch among others.  Moreover, these facts have been openly admitted and confessed to by Justice Aponte, the former Chief of the Criminal Appeals Chamber of the Venezuelan Supreme Court.  Justice

24

Aponte is one of the main protagonists and principal actors in the judicial terrorism that was perpetrated on the Plaintiff as set out in more detail below, with the sole nefarious goal of expropriating their property in violation of Venezuelan and international law.

41.    Venezuela, under the rule of the late President Chávez, as part of his Socialist Revolution, took affirmative steps to grant PEQUIVEN a monopoly over the petrochemical industry in Venezuela.  First, in 2005, President Chávez issued a decree that had the effect of transferring PEQUIVEN from being a subsidiary of Petróleos de Venezuela, S.A. ("PDVSA") to being an independent corporation attached to the Ministry of Popular Power for Petroleum and Mining.  Then, President Chávez, and the Venezuelan Government, proceeded to expropriate the interest of foreign companies in joint ventures owned and operated by PEQUIVEN and the foreign investor.  For example, in 2010, the Government of Venezuela seized the fertilizer company Fertilizantes Nitrogenados de Venezuela ("FertiNitro"), a joint venture between PEQUIVEN, Koch Industries, Inc. (an American company), Snamprogetti SpA and Empresas Polar S.A. (both Italian companies).

42.    In addition, the Government of Venezuela through its various agencies and/or instrumentalities including the PEQVIVEN; the Bolivarian National Guard; the Public Ministry of Popular Power for Interior Relations, Justice and Peace; the National Anti-Drug Office ("ONA"); the Supreme Court and lower courts; and the Prosecutor General's Office launched sham and baseless criminal proceedings that were used as

pretext to expropriate Venezuelan companies that provided logistical services to the petrochemical industry in Venezuela and particularly to PEQUIVEN. The Government of Venezuela then placed the expropriated companies under an illicit and extrajudicial receivership where PEQUIVEN was designated as the "Special Administrator" of the expropriated companies.

### THE WRONGFUL EXPROPRIATION OF PROPERTIES WITHOUT ANY COMPENSATION AND IN DISAVOWANCE OF PUBLIC PURPOSE OR PUBLIC UTILITY

43.     The Government of Venezuela under the rule of President Chávez engaged in an elaborate, but thinly veiled campaign to cover with the trappings of "legality" and, therefore "legitimacy" an expropriation that has its foundations in politically motivated discrimination, political persecution, corruption on the part of President Chávez and his regime, and that is wholly wanting in public purpose.

44.     As of the time the properties belonging to the Plaintiffs that are the subject matter of this Complaint were expropriated, the Plaintiffs were, and continue to be, Italian citizens.

45.     The confiscation and *de facto* expropriation of Marivelca, C.A. ("Marivelca") and the personal property of the Plaintiffs were motivated exclusively by President Chávez's political agenda of monopolizing the petrochemical industry in Venezuela and to grant exclusive control of such industry to the state-owned PEQUIVEN. The Government of Venezuela directly through PEQVIVEN, the

Bolivarian National Guard, the Public Ministry, ONA, the Supreme Court and lower courts and the Prosecutor General's Office expropriated Marivelca pursuant to a baseless and sham criminal proceeding launched with warrantless searches in violation of Venezuelan law and carried on by a criminal court in the city of Maracaibo, State of Zulia that did not have jurisdiction over Plaintiffs and Marivelca both of which were residents and conducting business in the cities of Valencia (Plaintiffs) and Guacara (Marivelca), State of Carabobo.

46.     According to Venezuelan law, the 23rd Prosecution Office of the Public Ministry in the State of Zulia should have requested the Prosecution Office of the Public Ministry in the State of Carabobo, where Marivelca had its principal place of business, in order to lawfully proceed with the search by applying for a search warrant.  In addition, a prosecutor from the Prosecution Office of the Public Ministry in the State of Carabobo should have been present during the warrantless searches of Marivelca.

47.     Accordingly, the Venezuelan Government and PEQUIVEN caused partisan and manipulated legal proceedings to take place with the objective of mischaracterizing political corruption and political persecution with the semblance of the rule of law.  In this connection, as set forth below, are some of the more salient partisan and manipulated findings and communications that Venezuelan courts, at the direction of the Venezuelan Government an PEQUIVEN, at the instance, direction, and in conformance with the Venezuelan Government, issued.

27

## THE EXPROPRIATION OF PLAINTIFFS' ASSETS INCLUDING
## MARIVELCA, C.A. & TRANS BENZ, C.A.

48.     Marivelca, C.A. is a corporation organized under the law of Venezuela in the State of Carabobo on September 13, 1990.   Marivelca has its principal place of business in the city of Guacara, State of Carabobo.   Until the Government of Venezuela expropriated it, Marivelca was in the business of selling chemical products and raw materials in the alimentary, petroleum, and petrochemicals industries.   Prior to its expropriation, Marivelca supplied the Venezuelan market with high quality products and exceptional pre and post sales customer service.   Marivelca had reliable national (including PEQUIVEN) and international suppliers that allowed it to widen the range of products in the Venezuelan market as well as through direct imports.

49.     Until the Venezuelan Government expropriated it on November 23, 2010, Marivelca had a close relationship with the public sector and the state-owned and operated businesses.    Marivelca provided material support to the Venezuelan Government's contingency plans established by the various state-owned enterprises. Marivelca was, and continues to be, a strategic provider to the Government of Venezuela.  Marivelca's principal clients include Electricidad de Caracas ("Electricidad" which is the power utility company for the city of Caracas), PDVSA, PEQUIVEN (through its commercial relationship with Univar), Siderúrgica de Orinoco ("SIDOR" which is the biggest Venezuelan steel corporation), Corporación Venezolana del Azúcar

28

(the Venezuelan state-owned sugar company), PETROPIAR (owned 60% by PDVSA and the operator of a vertically-integrated project in the Orinoco Belt, the world's largest known hydrocarbon deposit), PETROCEDEÑO (owned 60% by PDVSA and it is dedicated to the exploration, extraction, production, improvement and sale of crude oil), HIDROCAPITAL (Venezuelan state water utility responsible for managing, operating, expanding and rehabilitating potable water distribution systems) and HIDROS.   Because of its reliability and volume of business with the public sector, Marivelca earned the highest rating (i.e., 39 out of a maximum of 40) in the National Registry of Government Contractors.

50.    Plaintiffs owned 100% of the shares of Marivelca, each owning a 25% interest in Marivelca.  In June 2008, Marivelca was affected by an investigation launched by Public Ministry in the State of Zulia regarding an unrelated company, Suplidora del Caribe, C.A. ("Suplidora").  Marivelca maintained a normal commercial relationship with Suplidora in the role of Supplier/Client/Supplier.  Marivelca leased space from Suplidora's tanks to store hydrochloric acid in its location in the city of Maracaibo, State of Zulia.  Marivelca acquired the hydrochloric acid[7] from PEQUIVEN through its

---

[7] Hydrochloric acid is a clear, colorless, highly pungent solution of hydrogen chloride (HCl) in water.  It is a highly corrosive, strong mineral acid with many industrial uses.  Since 1988, hydrochloric acid has been listed as a Table II precursor under the 1988 United Nations Convetion Against Illicit Traffic in Narcotic Drugs and Psychtropic Substances because of its use in the production of heroin, cocaine, and methamphetamine.

petrochemical complex, "El Tablazo", located in the western section of the Zulia State. PEQUIVEN is the sole supplier of hydrochloric acid in Venezuela, and as such it is the only entity in Venezuela, that has the ability to obtain the required permits to import hydrochloric acid whenever it faces issues with its local production. Marivelca is part of PEQUIVEN's distribution network of specialized and certified distributors of hydrochloric acid for legal industrial applications.

51. At the request of PEQUIVEN, and for logistical reasons, Marivelca negotiated with Suplidora the use of one of its storage tanks as an intermediary storage location to facilitate the distribution of hydrochloric acid from PEQUIVEN's El Tablazo's petrochemical complex to Maracaibo, and from there, to their ultimate destination to either Electricidad or SIDOR. Suplidora, like all of the suppliers of storage to Marivelca, had all of the appropriate licenses, permits, and registrations to store hydrochloric acid.

52. Marivelca transported hydrochloric acid for over 2,000 km (1,242 miles) in order to perform on the Venezuelan Government's contingency plans to supply key public sector companies such as SIDOR, Electricidad, and Centrales Azucareros. Marivelca was able to provide this essential service to PEQUIVEN because, despite not having its own trucking fleet, it is one of the few companies that have a tanker truck specially treated for the transportation of hydrochloric acid.

53.     Marivelca's logistical support to PEQUIVEN was essential because Marivelca was able to deliver hydrochloric acid to the government entities which PEQUIVEN could not deliver itself due to the restrictive schedule for pick-up at El Tablazo's petrochemical complex.  In order words, it was impossible for PEQUIVEN to timely deliver hydrochloric acid to comply with the Venezuelan Government's contingency plans. Marivelca filled the gap by providing PEQUIVEN the logistical support to effectuate the timely deliveries by arranging a network of storage and distribution of the petrochemical products at intermediary points in the country so that it could pick-up the product from PEQUIVEN during its restrictive schedule and still deliver it at the time needed by the Venezuelan Government's owned and operated enterprises and public utilities.

54.     By virtue of the Venezuelan Government's investigation of Suplidora, Marivelca was the subject of a warrantless search on August 8, 2008 by the Anti-Drug division of the Bolivarian National Guard of Venezuela (the "National Guard") for the suspected illicit storage of controlled chemical substances pursuant to Article 31 of the Organic Law Against the Illicit Traffic and Consumption of Narcotics and Psychotropic Substances (the "Drug Trafficking Law").

55.     On October 20, 2008, there is another warrantless search by the ONA complying with a request of the 23rd Prosecutor's Office of the Public Ministry in the State of Zulia, which once again, acted beyond its territorial jurisdiction.

56.     As a result of the August and October 2008 warrantless searches, Plaintiffs were formally charged two (2) years later on August 2, 2010 with the crimes of (i) illicit storage of controlled chemical substances pursuant to the Drug Trafficking Law, and (ii) criminal conspiracy pursuant to Article 6 of the Organic Law Against Organized Crime (the "Organized Crime Law").  Both crimes were purportedly committed against the state of Venezuela.  The charges were filed with First Instance Tribunal for the Penal Circuit for the State of Zulia (the "Trial Court").

57.     During the August 2008 warrantless search, the National Guard reported a surplus of 1,371,470 kg (3 million pounds) of hydrochloric acid from the quantities indicated in the then registry of controlled substances.  However, such surplus allegation was wholly without merit based on Marivelca's documentation regarding purchases, sales, and inventory.   Moreover, it is important to note that Marivelca regularly obtained yearly registrations to store, distribute, and resell hydrochloric acid in amounts that always substantially exceeded PEQUIVEN's yearly manufacturing capacity of hydrochloric acid.  The fact that Marivelca received registrations to market and store quantities in excess of the production of Venezuelan's sole producer of hydrochloric acid is evidence that the registrations did not impose criminally enforceable limits for the storage of hydrochloric acid.

58.     Notably, the agents of the Venezuelan Government did not provide any factual basis to charge Plaintiffs by failing to provide a scintilla of evidence to comply

32

with Venezuelan criminal law's requirements of typicality, unlawfulness, and intent. Under Venezuelan law, before a person is charged with a crime, the three (3) elements of typicality, unlawfulness, and intent (i.e., *mens rea*) must be concurrent and a charge cannot be sustained if one of these elements is missing.

59.     In the particular criminal proceeding launched against Plaintiffs by the Government of Venezuela, the element of intent (*mens rea*) is lacking and there were no factual allegations presented so that it could be presumed.  Similarly, the elements of unlawfulness and typicality must be accompanied by the necessary factual allegations to establish presumptions.

60.     Marivelca has the required government permits, licenses and registrations to be an operator of controlled chemical substances because it is a legal entity that has been certified by the Government of Venezuela to commercialize in Venezuela controlled chemical substances.  Marivelca was properly registered with the Cuerpo de Investigaciones Científicas, Penales y Criminalísticas ("CICPC") of the Ministry of Popular Power for Internal Relations, Justice and Peace as a distributor of controlled chemical substances and it was authorized to market such substances with other CICPC licensed entities.   As previously noted, CICPC often issued Marivelca registrations to commercialize quantities in excess of PEQUIVEN's yearly capacity for the production of hydrochloric acid.

61.     It is important to note that Marivelca had to renew its registration with CICPC on a yearly basis and consequently it had to identify the products to be marketed and an estimate of the quantities pursuant to market projections and client base among others.  Also, the only chemical product that was the subject of the criminal charges is hydrochloric acid, and as set out above, the state-owned PEQUIVEN is the sole producer and supplier of hydrochloric acid in Venezuela.

62.     Further, it must be explained that the alleged surplus of 1,371,470 kilograms of hydrochloric acid reflected in the CICPC's registry for the time period of August 2007 through August 2008, was based on a request from PEQUIVEN to Marivelca so that it could perform in the Venezuelan Government's contingency plans for the supply of hydrochloric acid to Venezuelan Government's entities in charge of transforming the same such as SIDOR, Electricidad and Centrales Azucareros.  On a letter dated May 6, 2010, authored by Kertin T. Rangel, Manager of National Sales of PEQUIVEN and addressed to the Ministry of Defense, he stated:

> Dear Sirs: through this correspondence we inform and clarify that Pequiven as the provider and manufacturer at the national level of the product Hydrochloric Acid requested our client and distributor Marivelca C.A. (Code # 104650) in 2008 under its permit CICPC 4324 the possibility of serving the contingency plans for the supply of hydrochloric acid to manufacturing companies such as SIDOR, ELECTRICIDAD DE CARACAS, CENTRALES AZUCAREROS given that this Distributor is known for is timely deliveries and excellent post-sales service.
>
> At [PEQUIVEN] we are at your disposition for any additional information that your distinguished institution may need to assist with the proper implementation of its activities.

34

*See* **Exhibit 8**.[8]

63.     Furthermore, as previously stated, Marivelca had hydrochloric acid stored at the installation of Suplidora for logistical reasons in order to timely perform on the Venezuelan Government's contingency plans.  PEQUIVEN's schedule for the pick-up of hydrochloric acid at El Tablazo often did not coincide with the arrival of delivery trucks to load hydrochloric acid at the dates and times prescribed by PEQUIVEN.  Marivelca's arrangement with Suplidora for the lease of storage space at one of its tanks allowed Marivelca to load hydrochloric acid outside the schedule set by PEQUIVEN for their timely delivery to the Venezuelan Government's entities.

64.     It is axiomatic that Marivelca was not conducting any illegal activity and the criminal proceeding against Plaintiffs was launched as a pretext to further Venezuela's and PEQUIVEN's illicit scheme to expropriate Marivelca and the personal property of the Plaintiffs by the issuance of a "preventive" confiscation order regarding Marivelca and the personal assets of the Plaintiffs and arrests warrants for each of the Plaintiffs.  Marivelca was in the business of acquiring petrochemical products from the PEQUIVEN, an instrumentality of the Government of Venezuela, to distribute such products to other instrumentalities of the Government of Venezuela for which

_____

[8] An English translation of **Exhibit 8** will be filed with the Court at a subsequent time.  The language cited herein was translated by undersigned counsel, a native Spanish speaker.

35

PEQUIVEN lack the ability to timely deliver without engaging the services of Marivelca.

65.     As set out above, Marivelca and the Plaintiffs acted in compliance with Venezuelan law and engaged in the distribution and sale of hydrochloric acid at the request of the Government of Venezuela through its agency, PEQUIVEN.  First, as already noted, PEQUIVEN is the sole producer of hydrochloric acid in Venezuela and Marivelca legally purchased all hydrochloric acid from PEQUIVEN.  Second, Marivelca had all of the required licenses, permits and registrations from the Venezuelan Government to market hydrochloric acid.  Third, Marivelca purchased the hydrochloric acid from PEQUIVEN for the purpose of distributing it to other entities owned by the Venezuelan Government pursuant to governmental contingency plans and not to engage in illicit drug trafficking or for the manufacture of illicit drugs.  Fourth, the CICPC did not set out a fix quantity of hydrochloric acid that Marivelca could acquire from PEQUIVEN in light of the dynamic and ever changing distribution requirements of PEQUIVEN and other Venezuelan Government's entities.  Fifth, Marivelca presented all of the documentation during the warrantless searches for the acquisition of hydrochloric acid from PEQUIVEN, the subsequent sale to its clients (all of which were previously authorized by PEQUIVEN in its weekly dispatches), and the corresponding inventory.  Lastly, to extent that Marivelca had a "surplus" of hydrochloric acid the same was acquired at the request of Venezuelan Government's entities.

66.     The National Anti-Drug Office's ("ONA") law does not establish the quantities that may be commercialized by a distributor of controlled chemical substances.   Rather, the only requirement is that the distributors have a valid registration through its yearly renovations.   Further, Marivelca hired Suplidora to store hydrochloric acid at its tanks at the request of PEQUIVEN.   Suplidora was a well-known and reputable contractor in the State of Zulia and throughout Venezuela and its services were frequently retained by PEQUIVEN's former parent, PDVSA, as well as by other businesses in the petroleum industry.

67.     It is important to also note that the National Guard and the prosecutor's office in charge of the criminal case against Plaintiffs supported their criminal charges by alleging that they did not find certain invoices for the Marivelca's acquisition of hydrochloric acid from PEQUIVEN.   Yet, the National Guard failed to acknowledge the fact that PEQUIVEN (like many other private businesses) issues invoices some time after the dispatch and that Marivelca, as well as other PEQUIVEN's distributors, typically receive PEQUIVEN's invoices between fifteen (15) and twenty (20) days after the pick-up of the product at its petrochemical complex.

68.     Furthermore, distributors of controlled chemical substances such as Marivelca are required to send a monthly report of its purchases, sales, and inventory to ONA and CICPC and any irregularity can be detected within thirty (30) days.   In short, if there are any irregularities about the quantities of controlled substances, a criminal

37

investigation can be commenced immediately, and not more than two (2) years later as the authorities of the Government of Venezuela fabricated it in this case.

69.   Further yet, in December 2010, after PEQUIVEN was illegally appointed as the "special administrator" or receiver of Marivelca upon the expropriation of Marivelca from Plaintiffs on November 23, 2010, a physical audit of all purchases, sales and inventory for the time period of 2007 through 2010 was conducted.  This audit revealed a surplus of only 410 kilograms (903 pounds) of hydrochloric acid such surplus being within the normal tolerance margins associated with the weighing of the product purchased in bulk and its subsequent packaging for storage at Marivelca's warehouse.  The result of the physical audit was sent to the prosecutor's office via correspondence in January 2011, but like many other defensive pleadings and filings made by Plaintiffs in the same criminal proceeding have been fully ignored by the Venezuelan Courts and the Public Ministry in violation of Plaintiff's substantive and procedural due process rights.

70.   In fact, Plaintiffs filed pleadings and reports supporting their innocence in September and December 2010 and January 2011.  The criminal proceeding was deliberately put at sleep in disregard of Plaintiffs' rights to present their defense for the sole purpose of furthering the illicit scheme to expropriate Plaintiffs' property including Marivelca.  Moreover, Plaintiffs filed a petition for "avocamiento" before the Supreme Court on August 7, 2010.  The petition for "avocamiento" is an extraordinary relief

38

which litigants seek when a tribunal is failing to administer justice according to law. The goal of the petitioners in an "avocamiento" request is that the Supreme Court either take jurisdiction of the case or transfer jurisdiction of the same to a different lower court so that the case can be adjudicated according to Venezuelan law.

71.     On November 8, 2012, the Supreme Court rejected the petition for "avocamiento".  *See* **Exhibit 9**.[9]  Notably, one of the last independent and objective justices of the Supreme Court, Justice Blanca Rosa Mármol de León ("Justice Mármol de León"), issued a dissenting opinion in which she reasoned that the petition of "avocamiento" should have been granted.  *Id.* at 12-14.  Justice Mármol de León specifically wrote that:

> In the instant case, I consider that it was necessary to admit the petition and review the original case file in order to verify the claims raised in the petition for "avocamiento" including the alleged arbitrary and irregularities committed in the imposition of measures that affect the assets of the defendants, as well as the consequences, flowing from the diligences made by the Department of Control and Audit of Chemical Substances from the Anti-Drug Division of the Bolivarian National Guard especially if they concern the rights and guarantees of the defendants which can substantially harm the well administration of the Judicial Branch.  *Id.* at 13-14.

72.     The initial August 8, 2008 warrantless search by Lieutenant Leonardo Rodriguez Biel of the National Guard should have required the commencement of an

---

[9] An English translation of **Exhibit 9** will be filed with the Court at a subsequent time.  The language cited herein was translated by undersigned counsel, a native Spanish speaker.

**administrative proceeding** requiring Marivelca to present its defenses regarding the allegations regarding the storage of a surplus of hydrochloric acid.  Only after the conclusion of the administrative proceeding, and to the extent that there was probable cause that any criminal acts were committed, should a criminal proceeding by the Public Ministry commence.

73.    Here, Plaintiffs and Marivelca had the right to present their defense in an administrative proceeding was usurped by the Venezuelan authorities with the complicity of the Venezuelan courts.  If an administrative proceeding were launched, Plaintiffs and Marivelca would have been able to establish the hydrochloric acid that was stored at Suplidora's facility **was not stored for the purposes of manufacturing illegal drugs**.  Notably, Plaintiffs were charged with a crime under the Drug Trafficking Law requiring a *mens rea* element that the storage of the controlled chemical substances be for the specific purpose of manufacturing narcotic drugs or psychotropic substances. As it was well known to the Venezuelan Government, Marivelca in its twenty (20) year history never engaged in any manufacturing process involving controlled chemical substances.   Marivelca's was in the sole business of purchasing, distributing and reselling chemical substances and raw materials.

74.    On September 15, 2010, the Drug Trafficking Law under which Plaintiffs were charged was superseded with a new law called the Organic Drug Law (the "New Drug Trafficking Law") pursuant to Official Gazette No. 39.510.   The New Drug

Trafficking Law regulates all activities relating to the traffic, distribution, manufacturing, and storage of controlled substances.   In Venezuela, as in most civilized nations, laws are not presumptively retroactively.   However, when a new penal law favors the criminal defendant, the new penal law must be applied retroactively because it is illegal, pursuant to Article 2 of the Penal Code, to continue to prosecute a defendant (or to continue to impose a sentence) for a crime grounded on facts that no longer constitute criminal activity under the new penal law.   As set out above, the facts alleged in support of the charge under the old Drug Trafficking Law were insufficient to meet the *mens rea* element that the alleged storage of the hydrochloric acid was for the specific purpose of manufacturing narcotic drugs or psychotropic substances.

75.   Article 37 of the New Drug Trafficking Law provides that it is only illicit to store controlled substances if "its use or destination is different than the one authorized for these substances by the competent public entities."   Assuming *arguendo* that Plaintiffs were guilty for the mere storage of a surplus of hydrochloric acid, such facts no longer provide a basis to continue to prosecute Plaintiffs because Marivelca had all of the required government licenses, permits and registrations to buy, market, sell and distribute hydrochloric acid supplied by PEQUIVEN and destined to enterprises and public utilities owned and controlled by the Government of Venezuela.

76.   Similarly, the Government of Venezuela should not continue to prosecute Plaintiffs for the charge of criminal conspiracy because the conspiracy must involve the

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

commission of an illegal activity. As set out above Plaintiffs' conduct, even if all of the allegations against them were true, do not provide a basis for charging and prosecuting them with a violation of Venezuela's old Drug Trafficking Law or under the New Drug Trafficking Law.

77. The true purpose for the commencement of a criminal proceeding against the Plaintiffs was to expropriate their assets, including Marivelca. In fact, on April 9, 2010, the 23rd Prosecutor's Office the Public Ministry for the State of Zulia requested the "preventive" confiscation of the personal assets of Plaintiffs and Marivelca at the outset of the criminal proceeding, even though the National Guard had already "preventively" seized **all** (and not merely the alleged surplus) quantities of hydrochloric acid held by Marivelca during the August and October 2008 warrantless searches. On April 26, 2010, the Trial Court judge presiding over the criminal case rejected the prosecutor's request for the "preventive" confiscation order on the grounds that (a) the warrantless search of Marivelca was not factually connected to the separate ongoing criminal investigation of Suplidora and (b) it lacked territorial jurisdiction over the Plaintiffs in light of the fact that the criminal proceeding was filed in the State of Zulia and Plaintiffs and Marivelca were domiciled or the place of business in the State of Carabobo.

78. The prosecutor's office appealed the Trial Court's ruling denying the request for the "preventive" confiscation order of the personal assets of Plaintiffs and Marivelca. The appellate court reversed the Trial Court finding that it had jurisdiction

on the grounds that the facts of the criminal prosecution were connected to the facts involving the criminal investigation of Suplidora, an unrelated company.  As a result, on November 11, 2010, the trial court judge on remand issued the "preventive" confiscation order.

79.    Plaintiffs were criminally investigated for a period of two (2) years behind their backs in violation of the laws of Venezuela and international conventions signed and ratified by Venezuela.  Moreover, under Article 204 of the Organic Code of Criminal Procedure, a  "preventive" confiscation order can only be issued if the property to be seized is related to the criminal act being investigated.  The Government of Venezuela had already seized the alleged "surplus" of hydrochloric acid during its warrantless searches and thus it lacked the legal foundation to further "preventively" confiscate **all** of Plaintiffs' assets.  In fact, a plain reading of the Public Ministry's motion for the "preventive" confiscation order reveals, on its face, the factual and legal deficiencies alleged in support of the requested relief.

80.    The preventive confiscation order was executed by the ONA on November 23, 2010, which is the date in which the *de facto* expropriation of Marivelca took place.  Lieutenant Galvani Duarte Vanegas and attorney Maria Jose Briceño Diaz, agents of the asset forfeiture division of the ONA went to the corporate office of Marivelca to seize Marivelca and all of its assets.  The expropriation was documented through a 70 page "Recovery Minute" (which should have been denominated a

43

Preventive Confiscation Minute) which provided an inventory of all of the assets of Marivelca.  A copy of the Recovery Minute, Marivelca's inventory as of November 25, 2010 and Marivelca's bank accounts listing and balances as of November 25, 2010 are attached hereto as **Composite Exhibit 10**.[10]

81.     During the confiscation, Lieutenant Galvani Duarte Vanegas specifically told Plaintiff, Carmina R. Comparelli that "*through the judicial system the she would never get her property back and get out of this mess*".  The statement of Lieutenant Galvani Duarte Vanegas, an agent of the Government of Venezuela, clearly reveal and bear naked the true purpose of the criminal proceeding launched against Plaintiffs by Venezuela. Moreover, the late President Chávez made statements in his television talk show "Aló Presidente" ("Hello President") where he acknowledged the taking of Plaintiffs' property and slandered Plaintiffs by identifying them as criminals involved in drug trafficking.

82.     On November 26, 2010, only three (3) days after the "preventive" confiscation, the Government of Venezuela and PEQUIVEN's artifice to expropriate Marivelca became abundantly clear.  On that date, the ONA, through its then General Director, Néstor Luís Reverol Torres (who was later appointed by President Chávez to the post of Venezuela's Minister of Popular Power for Interior Relations, Justice and

---

[10] An English translation of **Composite Exhibit 10** will be filed with the Court at a subsequent time.

Peace for 2012-2013), and PEQUIVEN, through its President, Saul Ameliach, executed an extrajudicial minute of special administration (the "Receivership Order"). The Receivership Order is attached hereto as **Exhibit 11**.[11] On November 27, 2010, ONA and PEQUIVEN executed a minute of "provisional" assignment by which the ONA formally transfer custody and control of Marivelca to PEQUIVEN (the "Transfer Minute). The Transfer Minute is attached hereto as **Exhibit 12**.[12] The Transfer Minute was executed by Galvani Duarte Vanegas at the direction of Néstor Luís Reverol Torres on behalf of ONA and Pedro Jose Lugo Gomez executed it on behalf of PEQUIVEN. *Id.*

83.    The Receivership Order designated PEQUIVEN as the "Special Administrator" of Marivelca. *See* **Exhibit 11**. Under the Receivership Order, PEQUIVEN is to maintain, conserve, and use Marivelca. PEQUIVEN has been exercising ownership and control of Marivelca since the entry of the illicit and extrajudicial Receivership Order. Attached hereto as **Composite Exhibit 13** are documents evidencing PEQUIVEN's control and ownership of Marivelca including: (i) Marivelca's Financial Statements as of July 31, 2014; (ii) PEQUIVEN's March 2012 PowerPoint Presentation Regarding the Administration of Marivelca for 2010 through 2012; (iii) PEQUIVEN's January 2014 PowerPoint Presentation Regarding the

---

[11] An English translation of **Exhibit 11** will be filed with the Court at a subsequent time.

[12] An English translation of **Exhibit 12** will be filed with the Court at a subsequent time.

Administration of Marivelca for 2012 through 2013; and (iv) Marivelca's 2011-2012's sales data.

84.     Notably, PEQUIVEN's PowerPoint slides bear the red color theme that is the same color theme of the late President Chávez and President Maduro's political party, the United Socialist Party of Venezuela.  Moreover, the cover slide include the following text: "*Independence and Socialist Homeland . . . We will Live and Prevail!*" *Id.*  The politicization of PEQUIVEN as a flagship of the Socialist Revolution of the late President Chávez is clearly evidenced in the re-design of PEQUIVEN's corporate image. Moreover, in PEQUIVEN's recommendation letter attached hereto as **Exhibit 8** similar language appears the bottom of the letterhead that states "*Homeland, Socialism or Death*" and "*We will win*".

85.     As set out in detail above, the Government of Venezuela through a complex conspiracy of its instrumentalities and/or agencies including PEQUIVEN, ONA, the Bolivarian National Guard, the Venezuelan Courts including the Supreme Court, the Prosecutor General's Office and the Public Ministry of Popular Power for Interior Relations, Justice and Peace colluded with one another to initiate and prosecute a sham and baseless criminal proceeding against Plaintiffs in order to expropriate Marivelca and their personal assets in a scheme to place Marivelca under the direct ownership and management of PEQUIVEN.

86.     In fact, Plaintiffs were not the only victims of the Government of Venezuela's scheme to expropriate companies that provided logistical services to the petrochemical industry in Venezuela and particularly to PEQUIVEN.  Upon information and belief, the same or a substantially similar scheme was used to expropriate the following companies: (i) Suplidora del Caribe, C.A.; (ii) Industrias Flopol, C.A.; (iii) Centro Químico, C.A.; (iv) Importaciones y Exportaciones R. Garmo, C.A.; and (v) Inversiones Trans Benz, C.A.  In short, Venezuela and PEQUIVEN engaged in a pattern of illicit takings of property or expropriation through mock legal proceedings in furtherance of the political and illicit goal of monopolizing the petrochemical sector pursuant to the Socialist Revolution instituted by the late President Chávez.

87.     Inversiones Trans Benz, C.A. ("Trans Benz") is company organized under Venezuelan law.  Trans Benz was the trucking arm of Marivelca.  Until Trans Benz was expropriated by the Government of Venezuela and PEQUIVEN, Plaintiff, Julio C. Delgado Comparelli owned it 100%.  PEQUIVEN currently owns and operates Trans Benz as demonstrated in the PowerPoint Presentation for its 2012 operations.  *See* **Exhibit 14**.

88.     In order to further accomplish its scheme to expropriate the assets of Plaintiffs, the Government of Venezuela through its agencies and/or instrumentalities proceeded to seek, and unlawfully obtained, arrest warrants against each of the

47

Plaintiffs on February 4, 2011 pursuant to Public Ministry's request filed on February 2, 2011.  The application for the arrest warrants was filed by Mario Segundo Molero Rodríguez and Carlos Alberto Rodríguez Torrealba, both of which acted on behalf of their employer, the Prosecutor General's Office for the 77th Judicial District and by the attorneys María Eugenía Morales Tovar, Jesús Angel Estrada Gómez and Heiddy Azuaje Mora, all of which acted on behalf of their employer the 23rd Prosecutor's Office of the Public Ministry for the State of Zulia.  The arrest warrants were requested due to "the extreme necessity and urgency to restrict the liberty *in promptu* of Plaintiffs, the shareholders of Marivelca for the alleged commission of the charged crimes of illicit storage of controlled chemical substances and criminal conspiracy."

89.    The arrest warrants were illegally issued since all of the Plaintiffs had appeared before the Trial Court in order to present their defense and even testify in support of their defense.  The arrest warrants were issued in violation of several articles of the Organic Code of Criminal Procedure including: Article 1 (due process), Article 8 (presumption of innocence), Article 9 (requiring exceptionality for preventive arrest warrants), Article 10 (respect for defendant's rights to a defense), Article 12 (right of defense), Article 13 (due process), Article 18 (adversarial proceedings), Article 19 (respect of Constitution by the judicial branch), and Article 230 (requisites for the issuance of a preventive arrest warrant).

90.     The arrest warrants were issued with the goal of forcing Plaintiffs to leave their beloved Venezuela so that they could no longer challenge the unlawful expropriation of their assets.  In fact, the arrest warrants were applied for a few days after Marivelca, under the receivership of PEQUIVEN, issued a report containing a physical audit demonstrating that there was only a minor, within normal ranges, surplus of hydrochloric acid.  Subsequently, the Government of Venezuela sough the extradition of Plaintiffs, Freddy E. Lopez Comparelli and Loryelena Delgado Comparelli from Costa Rica.

91.     On July 23, 2012, the Costa Rican Appellate Tribunal for Penal Sentences of the Second Circuit (the "Costa Rican Appellate Court") in San José reversed a Costa Rican Trial Court ruling issued on April 9, 2012 granting the Government of Venezuela's extradition request concerning Plaintiff, Freddy E. Lopez Comparelli.  *See* **Exhibit 15**.[13]   The Costa Rican Appellate Court reversed the grant of the extradition request and ordered the immediate release of F. Comparelli who had been imprisoned pursuant to the Government of Venezuela's extradition request for approximately one (1) year.  *Id.*

92.     The Costa Rican Appellate Court denied the Government of Venezuela's extradition request on the ground that the same lack did not meet the "dual

----

[13] An English translation of **Exhibit 15** will be filed with the Court at a subsequent time.  The language cited herein was translated by undersigned counsel, a native Spanish speaker.

criminality" requirement.  *Id.* at 31-32.  The "dual criminality" is a requirement under the extradition law of many countries.  The "dual criminality" requirement provides that a suspect can be extradited from one country to stand trial for breaking a second country's law **only** when a similar law exists in the extraditing country.  In its well-reasoned opinion, the Costa Rican Appellate Court found that the Government of Venezuela's extradition must be denied because: (i) there was a lack of factual basis to charge F. Comparelli individually for the alleged surplus of hydrochloric acid held by Marivelca and (ii) even if F. Comparelli's was criminally liable for the surplus of hydrochloric acid on a theory of joint liability for his mere status as manager and/or shareholder of Marivelca, the laws of both Venezuela and Costa Rica require that the storage of controlled chemical substances be for a specific purpose.  *Id.* at 31-32.

93.     The Costa Rican Appellate Court's review of the then applicable Venezuelan law found that the storage of a controlled chemical substance must be "for the production of narcotic drugs and psychotropic substances" and similarly the applicable Costa Rican law criminalizes the storage of controlled chemical substances "for the manufacturing, elaboration, refining, transformation, and extraction, etc. of narcotic drugs and psychotropic substances."  *Id.* at 31-32.  The Costa Rican Appellate Court found that both Venezuelan and Costa Rican law require a specific final purpose for the storage of controlled chemical substances and such purpose is the production of narcotic drugs and psychotropic substances.  *Id.*

50

94.     The Costa Rican Appellate Court further found that the Government of Venezuela's extradition request, as well as the documentation provided in support pertaining to the criminal proceeding pending in Venezuela, did not include a single factual reference alleging that Marivelca or F. Comparelli, in his personal capacity or in his capacity as manager of Marivelca, had the criminal intention or attempted intention of allocating, totally or partially, the hydrochloric acid stored by Marivelca, during the relevant time, for the production of narcotic drugs or psychotropic substances.  *Id.*   The Costa Rican Appellate Court further concluded that the facts of F. Comparelli are **atypical** in light of the applicable laws of Venezuela.  *Id.* at 32.   The Costa Rican Appellate Court also concluded the "criminal conspiracy" charge also lacked merit because it has a prerequisite that the conspiracy be for the commission of an illegal act. *Id.* at 34.     Finding, that the main charge alleged of storing controlled chemical substances was meritless, the criminal conspiracy charge would fail as well.  *Id.*

95.     The judgment of the Costa Rican Appellate Court, the only truly independent tribunal adhered to the rule of law, that has fully and carefully reviewed the unfounded allegations concerning the criminal proceeding that was launched by the Venezuelan Government against Plaintiffs basically found, in more diplomatic terms, that the criminal proceeding is a farce and a Machiavellian deployment of judicial terrorism.  The mock criminal proceeding filed and prosecuted against Plaintiffs at the

behest of the Government of Venezuela had the nefarious goal of expropriating their property in violation of international law.

96.     As previously noted, the only truly independent and objective Venezuelan judge that played a role in the sham legal proceedings before the Venezuelan courts was Justice Mármol de León, one of the last dissenting voices of the Venezuelan Supreme Court that did not play into the so called Socialist Revolution's way of "justice administration".   Justice Mármol de León was forced to leave the bench[14] because of her frequent dissenting opinions denouncing the illegality and arbitrarily of the judicial branch in Venezuela.

97.     Justice Mármol de León issued a dissenting opinion in the Supreme Court ruling issued on August 9, 2011 requesting the extradition of Plaintiffs, F. Comparelli

---

[14] Justice Mármol de León was forced to retire early from the Supreme Court. Although Justice Mármol de León reached the retirement age, she desired to remain in her post until her replacement was elected by 2/3 of the National Assembly.  In order to get rid of Justice Mármol de León, the Supreme Court of Venezuela decided to appoint her substitute until her replacement is confirmed by the National Assembly.  This was an illegal act because under Venezuelan law the substitute of Venezuelan Supreme Court Justice can only take a seat upon a **temporary** absence of the main Justice. Because Justice Mármol de León's decision to retire constituted an absolute or permanent absence from her post in the Supreme Court, there was no legal basis to replace her with her substitute prior to the confirmation of her successor by the National Assembly.

and L. Comparelli.  *See* **Exhibit 16** at pgs. 43-49.[15]  In this ruling, Justice Aponte

participated and signed the opinion for the majority.  *Id.* at 43.[16] Justice Mármol de León

reasoned that the arrest warrants issued against Plaintiffs were based on alleged

administrative irregularities in the inspection and audit of Marivelca and that because

such irregularities are of an administrative nature they do not constitute sufficient

grounds to issue an arrest warrant.  *Id.* at 46-49.

98.     Justice Mármol de León found that all of the applicable laws to the case at

bar for the alleged violations of law should have been adjudicated in an administrative

proceeding.   Justice Mármol de León also found that only after the suspicion of

irregularities is confirmed in the administrative proceeding should a criminal

investigation be commenced.  *Id.*  Moreover she also found that once the criminal

investigation is commenced, the Public Ministry should seek apply for a search warrant

pursuant to Article 210 of the Organic Code of Criminal Procedure.  *Id.*  Justice Mármol

de León went to also find that the Supreme Court should have annulled the August 11,

2008 warrantless search of Marivelca because the same was conducted without a proper

---

[15]  An English translation of **Exhibit 16** will be filed with the Court at a subsequent time.  The language cited herein was translated by undersigned counsel, a native Spanish speaker.

[16]  As set out in detail above and in the exhibits to 4 and 7 to this Complaint, Justice Aponte has openly denounced the lack of independence of the Venezuelan judicial branch and he admitted that the late President Chávez would telephone him directly to order him how to decide cases.

search warrant and the fruits of the warrantless search constitute unlawfully obtained and inadmissible evidence. *Id.*

99.     Moreover, Justice Mármol de León also found that the warrantless search by the National Guard did not qualify as an exception justifying a warrantless search because the search was not conducted to stop the perpetration or execution of a crime. *Id.* Justice Mármol de León found instead that the purpose of the warrantless search was conducted to find motives to issue an arrest warrants against the Plaintiffs. *Id.* The reasoning and opinion of a respected jurist such as Justice Mármol de León provide further support for the irregular, arbitrary, and illegal nature of the criminal proceeding instituted against Plaintiffs by the Government of Venezuela.

100.     The criminal proceeding filed against Plaintiffs was part of an elaborate, fraudulent, corrupt, and partisan exercise of sovereignty and administrative functions by the Government of Venezuela and its instrumentalities and/or agencies including PEQUIVEN. The allegations asserted against Plaintiffs to institute and prosecute the criminal proceeding were false and known by the Government of Venezuela and PEQUIVEN to have been false at the time that they were made. The criminal allegations against the Plaintiffs were exclusively fashioned for purposes of furthering an expropriation scheme in violation of international law.

101.     The illicit expropriation of Marivelca and all of the personal assets of the Plaintiffs, including personal real estate (apartments, houses, land), bank accounts,

companies (Marivelca, C.A. and Trans Benz, C.A.) as well as their corresponding assets including A/R, equipment, inventory, real estate, bank accounts, etc. was the product of a discriminatory political persecution in stark disavowance of any public purpose or public utility and without any compensation.  Neither the Government of Venezuela nor PEQUIVEN tendered Plaintiffs **any** compensation in any amount arising from the expropriation of their assets.  The property of the Plaintiffs including their corporations and their assets were only expropriated as part of the Venezuelan Government's discriminatory and politically motivated goal of granting PEQUIVEN a monopoly over the petrochemical industry in violation of conventional international law, customary international law, the very laws of the Bolivarian Republic of Venezuela, and the laws of the United States.

## COUNT I

### Unlawful Expropriation of Plaintiff's Assets

102.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 101 above as if fully set forth herein.

103.    Defendants, Venezuela and PEQUIVEN, acted in furtherance of political persecution, and discriminatorily, against the Plaintiffs and as part of this political persecution and discriminatory practice expropriated without any compensation and in violation of international customary law, international conventional law, the laws of the

55

United States of America, and the laws of Venezuela, the property described in paragraphs 48 through 101, above.

104.   Plaintiff's assets were expropriated without legal or factual justification, as it had demonstrated and established trajectory of solvency, liquidity, profitability, customer service and reliability and otherwise complied with every standard of commercial viability pursuant to the laws of Venezuela.

105.   Marivelca, C.A., Trans Benz, C.A. and all of the Venezuelan-based assets of the Plaintiffs were expropriated on November 23, 2010.  As part of this expropriation, the Government of Venezuela designated PEQUIVEN as the special administrator of the expropriated assets and since then PEQUIVEN has continuously mismanaged the assets under its "special" administration.

106.   Plaintiffs were directly and proximately damaged as a direct and proximate result of this expropriation.  The Government of Venezuela and PEQUIVEN did not tender any compensation in any amount or offer to tender any compensation in any amount incident to the expropriation.

107.   PEQUIVEN currently owns and/or operates the assets that were expropriated from the Plaintiffs including Marivelca, C.A. and Trans Benz, C.A.

108.   The Government of Venezuela and PEQUIVEN's actions violate and Plaintiffs' causes of action arise under the following laws, agreements, conventions, resolutions, and treaties, which constitute specific examples of the applicable law of

56

nations and of conventional and customary international law as well as recognized principles of international law:

    (i)    American Convention on Human Rights adopted at San José, Costa Rica on November 22, 1969 and entered into force on July 18, 1978 in accordance with Article 74.2 of the Convention.  The relevant articles of this Convention are:

        (a)    Article 1. Obligation to Respect Rights

        (b)    Article 5. Right Humane Treatment

        (c)    Article 7. Right to Personal Liberty

        (d)    Article 8. Right to a Fair Trial

        (e)    Article 10. Right to Compensation

        (f)    Article 11. Right to Privacy

        (g)    Article 21. Right to Property

        (h)    Article 24. Right to Equal Protection

        (i)    Article 25. Right to Judicial Protection

        (j)    Article 29. Restrictions Regarding Interpretation

    (ii)    American Declaration of the Rights and Duties of Man adopted at Bogotá, Colombia in April 1948 and entered into force April 1948 is a source of binding international obligations for the Organization of American States such as Venezuela pursuant to the rulings of the Inter-American

Commission of Human Rights and the Inter-American Court of Human Rights.  The relevant articles of this Declaration are:

(a)     Article I. Right to life, liberty and personal security

(b)     Article II. Right to equality before law

(c)     Article V. Right to protection of honor, personal reputation, and private and family life

(d)     Article VIII. Right to residence and movement

(e)     Article XVIII. Right to recognition of juridical personality and civil rights

(f)     Article XVIII. Right to a fair trial

(g)     Article XXII. Right to property

(h)     Article XXIV. Right of petition.

(i)     Article XXV. Right of protection from arbitrary arrest

(j)     Article XXVI. Right to due process of law

(iii)   International Covenant on Civil and Political Rights, signed by the United States on October 5, 1977 and ratified on June 8, 1992 (with reservations), and signed by the Republic of Venezuela on June 24, 1969 and ratified on May 10, 1979 (with reservations).  The relevant articles of this Convention are:

(a)     Article 2

58

      (b)     Article 3

      (c)     Article 5

      (d)     Article 9

      (e)     Article 14

      (f)     Article 17

      (g)     Article 26

(iv)    United Nations General Assembly Resolution 3281, Charter of Economic Rights and Duties of States enacted on December 12, 1974.  The relevant article of this Resolution is Article 2.

109.    Without limitation to the conventions, declarations, treaties, and laws here cited and otherwise referenced, Defendants' actions constitute willful violations of the following articles of the Universal Declaration of Human Rights:

      (a)     Article 1

      (b)     Article 3

      (c)     Article 5

      (d)     Article 8

      (e)     Article 9

      (f)     Article 10

WHEREFORE, Plaintiffs, Carmina R. Comparelli, Freddy E. Lopez Comparelli, Loryelena Delgado Comparelli, and Julio C. Delgado Comparelli, respectfully demands

judgment against Defendants, the Bolivarian Republic of Venezuela, and  Petroquímica de Venezuela, S.A., for damages, including fair market value of their assets as of the date prior to the expropriation, together with any additional compensatory damages, interests, costs and incidental damages that this Court deems to be fair, equitable and appropriate.

Dated:  November 19, 2014

Respectfully submitted,

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
E-mail: rodrigo@rdasilvalaw.com
Telephone:    (305) 615-1434
Facsimile:      (305) 615-1435

By: /s/ Rodrigo S. Da Silva
    Rodrigo S. Da Silva, Esq.
    Florida Bar No. 0088600
    *Counsel for Plaintiffs*

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.