**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 14-24414-CIV-WILLIAMS**

CARMINA COMPARELLI, *et al.*,

      Plaintiffs,

v.

BOLIVIARIAN REPUBLIC OF
VENEZUELA, *et al.*,

      Defendants.

_____/

<u>**ORDER**</u>

**THIS MATTER** is before the Court on the Consolidated Motion to Dismiss this Case ("***Consolidated Motion***") filed by Defendants Bolivarian Republic of Venezuela ("***Venezuela***" or "***Venezuelan government***"), Petroquímica de Venezuela, S.A. ("***Pequiven***"), and International Petrochemical Sales, Ltd. ("***IPSL***") (collectively, "***Defendants***"). (DE 297.) Plaintiffs Carmina R. Comparelli ("***C. Comparelli***") and Julio C. Delgado Comparelli ("***J. Comparelli***") (collectively, "***Plaintiffs***") responded and Defendants replied. (DE 300; DE 302.) For the reasons that follow, Defendants' Motion is granted and this case is dismissed with prejudice.

I.    **BACKGROUND**

This case arises from the Venezuelan government's November 2010 seizure of Marivelca C.A. ("***Marivelca***"), a Venezuelan company involved in the sale of chemical products and raw materials. (DE 85 ¶ 1.) Before Marivelca's seizure, Plaintiff Carmina R. Comparelli was the company's sole shareholder, having increased her interest in the company from 25% to 100% after three of her family members sold her their shares. (*Id.* ¶ 54 n.9.) C. Comparelli states that she was born in Italy and resided in Venezuela for much of her life, but currently lives in Miami-Dade County, Florida on a treaty investor (E-2) visa. (*Id.* ¶ 1.) C. Comparelli's son, Plaintiff Julio C. Delgado Comparelli, held a 25% equity interest in Marivelca until he sold his

shares to C. Comparelli. (*Id.* ¶ 54 n.9.) However, J. Comparelli states that he was the sole shareholder of Inversiones Trans Benz, C.A. ("***Trans Benz***"), a Venezuelan company that served as Marivelca's "trucking arm" until the seizure occurred. (*Id.* ¶¶ 2, 49.) J. Comparelli avers that he was born in Venezuela and resided in the country for much of his life, but currently lives in Miami-Dade County, Florida where he is a naturalized U.S. citizen. (*Id.* ¶ 2; *see also* DE 85-3 (copy of J. Comparelli's current U.S. passport, demonstrating that he is now a U.S. citizen).)

Plaintiffs state that, until the Venezuelan government seized Marivelca, the company "was in the business of selling chemical products and raw materials in the alimentary, petroleum, and petrochemicals industries." (DE 85 ¶ 52.) Plaintiffs maintain that Marivelca "supplied the Venezuelan market with high quality products and exceptional . . . customer service . . . . [with] reliable national (including PEQUIVEN) and international suppliers that allowed it to widen [its] range of products in the Venezuelan market . . . [and engage in] direct imports." (*Id.*) Plaintiffs describe Pequiven "a Venezuelan state-owned petrochemical company engaged in the domestic production and sale of petrochemical products, including fertilizers, industrial chemical products, olefins, and plastic resins." (*Id.* ¶ 10.) Prior to Marivelca and Trans Benz's seizure, the company maintained "a close relationship with the public sector and [Venezuela's] state-owned and operated businesses" such as Pequiven, by "provid[ing] material support to the Venezuelan [g]overnment's contingency plans established by [] various state-owned enterprises . . . [and serving as] a strategic provider to the Government of Venezuela." (*Id.* ¶ 53.)

One of the chemical products that Marivelca regularly sold was hydrochloric acid, which Plaintiffs describe as "a clear, colorless, highly pungent solution of hydrogen chloride (HCl) in water." (*Id.* ¶ 54 n.10.) The record establishes that hydrochloric acid is used not only as a drilling agent in the petroleum industry but also to produce illicit drugs. (*Id.* ¶ 54 n.10; *see also* DE 297 at 6, 9 (citing DE 297-5 at 34–35).) Plaintiffs state that Pequiven "is the sole supplier of

hydrochloric acid in Venezuela, and as such[,] it is the only entity in Venezuela[] that has the ability to obtain the required permits to import hydrochloric acid whenever [Pequiven] faces issues with its local production." (DE 85 ¶ 27.) Marivelca was "part of PEQUIVEN's distribution network of specialized and certified distributors of hydrochloric acid for legal industrial applications." (*Id.*)

Plaintiffs claim that Marivelca had a "normal commercial relationship" with Suplidora del Caribe, C.A. ("***Suplidora***")—a company that, among other services, stored chemicals for other businesses—and had negotiated with Suplidora to use some of its tanks "as an intermediary storage location to facilitate the distribution of hydrochloric acid from PEQUIVEN's El Tablazo petrochemical complex to Maricaibo, [Venezuela,] and from there, to their ultimate destination to either Electricidad [de Caracas, a utility company in Venezuela's capital city] or SIDOR [Siderúrgica de Orinoco, a large steel corporation in Venezuela]." (*Id.* ¶¶ 54–55.) However, Plaintiffs claim that, because of "the Venezuelan [g]overnment's investigation of Suplidora, Marivelca was the subject of a warrantless search on August 8, 2008, by the Anti-Drug division of the Bolivarian National Guard of Venezuela . . . for the suspected illicit storage of controlled chemical substances," in accordance with a Venezuelan anti-drug trafficking law. (*Id.* ¶ 58.) A local prosecutor's office then conducted another warrantless search two months later. (*Id.* ¶ 59.)

Plaintiffs state that, "[a]s a result of the August and October 2008 warrantless searches, [they] . . . were formally charged two [] years later on August 2, 2010[] with the crimes of (i) illicit storage of controlled chemical substances pursuant to [Venezuela's] Drug Trafficking Law, and (ii) criminal conspiracy pursuant to [a Venezuelan anti-organized crime law]." (*Id.* ¶ 61.) But Plaintiffs maintain that Marivelca "had the required government permits, licenses and registrations to be an operator of controlled chemical substances because it [was] a legal entity that [had] been certified by the Government of Venezuela to commercialize controlled substances in Venezuela." (*Id.* ¶ 64.) Plaintiffs also argue that Marivelca did not store a surplus

for impermissible reasons, but, rather, to satisfy Pequiven's often unpredictable demands for the delivery of hydrochloric acid to certain Venezuelan governmental entities. (*Id.* ¶ 67.)

On November 23, 2010, Plaintiffs claim that the Venezuelan government seized control of (*i.e.*, expropriated) Marivelca and Trans Benz. (DE 85 ¶¶ 115.) Thereafter, the Venezuelan government appointed Pequiven to serve as the receiver of Marivelca. (*Id.* ¶ 73.) Plaintiffs then unsuccessfully challenged the seizure in Venezuela's judicial system (*see id.* at ¶¶ 74–83)**,** claiming that Marivelca, under Pequiven's receivership, "issued a report containing a physical audit demonstrating that [Marivelca had] . . . only a minor, within normal ranges, surplus of hydrochloric acid." (*Id.* ¶ 96.) Nevertheless, on February 4, 2011, the Venezuelan government subsequently obtained arrest warrants against Plaintiffs. (*Id.* ¶ 94.) Plaintiffs contend that Venezuela issued these warrants "with the goal of forcing Plaintiffs . . . to leave Venezuela so that they [w]ould no longer challenge the unlawful expropriation of their assets." (*Id.* ¶ 96.) Plaintiffs did leave Venezuela and ultimately settled in the United States. (*Id.* ¶¶ 1–2.)

On November 19, 2014, Plaintiffs and their relatives Freddy E. Lopez Comparelli and Loryelena Delgado Comparelli initiated the above-captioned case against Venezuela and Pequiven and filed the Initial Complaint pursuant to the federal Foreign Sovereign Immunities Act's ("**FSIA**") expropriation exception, codified at 28 U.S.C. § 1605(a)(3). (DE 1 at 3); *see also infra* Section II (discussing the FSIA's expropriation exception in more detail).   The Initial Complaint alleged one count of unlawful expropriation of assets, arguing that Venezuela and Pequiven seized Marivelca "without any compensation and in violation of international customary law, international conventional law, the laws of the United States of America, and the laws of Venezuela[] . . . ." (*Id.* at 55–56.) Early in the litigation, Freddy and Loryelena Comparelli voluntarily dismissed their claims against Venezuela and Pequiven. (DE 53.)

On September 23, 2016, the Court granted Venezuela and Pequiven's motions to dismiss the Initial Complaint and dismissed the above-captioned case for lack of jurisdiction. (DE 75.) The Court stated in part that "[t]his case is a quintessential 'foreign-cubed' case . . . .

[in which] [a]ll of the relevant conducted alleged in the [Initial] Complaint . . . occurred in Venezuela . . . ." (*Id.* at 4–5.) During the pendency of Plaintiffs' appeal to the U.S. Court of Appeals for the Eleventh Circuit ("***Eleventh Circuit***"), the U.S. Supreme Court rendered its decision in *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Company*, 137 S. Ct. 1312 (2017), which changed the standard that district courts must apply in determining whether they have jurisdiction in a matter alleging that a foreign sovereign expropriated an individual's property in a foreign state. *Id.* at 1316–17; *see also infra* Section II. Consequently, on June 8, 2018, the Eleventh Circuit set aside the dismissal and remanded this case back to this Court to permit Plaintiffs to file an amended complaint and ascertain whether the Court has jurisdiction over Plaintiffs' claims.[1] *Comparelli v. Republica Bolivariana De Venez.*, 891 F.3d 1311, 1328 (11th Cir. 2018).

On September 23, 2018, Plaintiffs filed the operative Amended Complaint. (DE 85.) In addition to Venezuela and Pequiven, the Amended Complaint names IPSL as a Defendant for the first time. (DE 85.) Plaintiffs describe IPSL as "a subsidiary of PEQUIVEN organized and existing pursuant to the laws of . . . the British Virgin Islands . . . . [and organized to] carr[y] on the business of PEQUIVEN rather than its own because it is the commercial arm of PEQUIVEN in charge of international sales of fertilizer products in bulk." (*Id.* ¶ 11 n.5.) In other words, IPSL acts as "the *de facto* sales department of PEQUIVEN for PEQUIVEN's foreign customers." (*Id.* ¶ 5.) Plaintiffs argue that IPSL acted as an "alter ego of PEQUIVEN" during and after Marivelca and Trans Benz's seizure. (*Id.*) Plaintiffs seek "damages, including fair market value of their assets as of the date prior to the expropriation and their estimated discounted cash flow, together with any compensatory damages, interests, costs[,] and incidental damages that this

---

[1] Specifically, the Eleventh Circuit determined that this Court, on remand, should "address whether the domestic takings rule applies and whether jurisdiction exists under the FSIA's expropriation exception." *Comparelli v. Republica Bolivariana De Venez.*, 891 F.3d 1311, 1328 (11th Cir. 2018). The Eleventh Circuit also noted that "[j]urisdictional discovery and the presentation of evidence may be required, but [] left those matters in the discretion of the district court." *Id.* (citation omitted). Finally, the Eleventh Circuit stated that "[b]ecause *Helmerich* heightened the proof required of the Comparellis to establish jurisdiction under the expropriation exception of the FSIA, they should be allowed to amend their complaint." *Id.*

Court deems to be fair, equitable[,] and appropriate." (*Id.* at 53.) Defendants moved to dismiss the Amended Complaint (DE 87; DE 88; DE 106), and the Court subsequently stayed proceedings due to political issues in Venezuela. (DE 168.)

On February 17, 2021, after the initial phase of the COVID-19 pandemic had passed, the Court deemed jurisdictional discovery necessary to ascertain whether the FSIA's expropriation exception applies to this case and entered a Scheduling Order on Jurisdictional Discovery. (DE 197.) Following a litany of discovery disputes and other pretrial issues, the Court held a status conference with the Parties on February 8, 2022 ("**Status Conference**"). (DE 290; DE 291.) At the Status Conference, the Court first disposed of several objections to Magistrate Judge Chris M. McAliley's rulings on certain jurisdictional discovery matters. (DE 291; DE 292.) Thereafter, the Parties "informed the Court that they have agreed that Defendants will file final motions for dismissal, updating their arguments for dismissing this case, eliminating disputes that are no longer at issue in this case [following the close of jurisdictional discovery], and addressing whether the additional discovery propounded in this case[] . . . []affects the jurisdictional issues underlying this case." (DE 293.) Based on the foregoing, the Court denied as moot the Defendants' initial motions to dismiss the Amended Complaint. (DE 298.)

On March 8, 2022, Defendants filed the instant Consolidated Motion to Dismiss for Lack of Jurisdiction. (DE 297.) Plaintiffs responded in opposition and Defendants later replied. (DE 300; DE 302.) Accordingly, the Consolidated Motion is now ripe before the Court.

II.   **LEGAL STANDARD**

The federal Foreign Sovereign Immunities Act ("**FSIA**" or "**the Act**") "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Generally, under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia*,

507 U.S. at 355 (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488–89 (1983)); *see also Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1296 (11th Cir. 2005) ("A foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable.").

Plaintiffs have initiated the above-captioned case under the FSIA's expropriation exception to foreign sovereign immunity (*see* DE 85 ¶¶ 112–120), which states that foreign sovereign immunity "does not apply in any case 'in which rights in property taken in violation of international law are at issue.'" *Comparelli*, 891 F.3d at 1319 (quoting *Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1228 (11th Cir. 2018)). A plaintiff may bring suit under the expropriation exception if: (1) property rights are at issue; (2) property was taken by the defendant foreign state; (3) the taking violates international law; *and* (4) at least one of the two statutory nexus requirements applies. 28 U.S.C. § 1605(a)(3). The nexus requirement is satisfied if the property at issue (*i.e.*, the property taken by the foreign state), or any property exchanged for such taken property, is either: (1) present in the United States in connection with a commercial activity carried on in the United States by a foreign state; *or* (2) owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States. *Id.* In FSIA cases, district courts "must determine, as a threshold matter, whether [they] ha[ve] subject matter jurisdiction over the claims at issue." *Trigeant Ltd. v. Petroleos de Venezuela S.A.*, 2010 WL 11505968, at *9 (S.D. Fla. Jan. 5, 2010) (citing *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 929 (2d Cir. 1998), *overruled on other grounds by Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014)).

The Court must answer this threshold question, given that Defendants argue in their Consolidated Motion that the Court lacks jurisdiction because the FSIA's expropriation exception does not apply here. (*See* DE 297 at 18–27.) Prior to the Supreme Court's 2017

decision in *Helmerich*,[2] a plaintiff's FSIA exception case could survive a district court's initial jurisdictional inquiry if the plaintiff made "a 'nonfrivolous' argument that the[ir] case f[ell] within the scope of [an] exception." *Helmerich*, 137 S. Ct. at 1316. Further, a district court deciding whether to dismiss such a cause of action only needed to apply the "usual pleading standards applied on a [Fed. R. Civ. P.] 12(b)(6) motion to dismiss, where a plaintiff's factual allegations are taken as true." *Comparelli*, 891 F.3d at 1319. However, the Supreme Court decided in *Helmerich* that "a party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is [alone] insufficient to confer jurisdiction . . . ." 137 S. Ct. at 1316; *see also Comparelli*, 891 F.3d at 1315 (confirming that the new *Helmerich* standard "detail[s] the showing that plaintiffs such as the Comparellis [in this case] must [now] make in order to have jurisdiction over a foreign state in United States courts under the expropriation (*i.e.*, takings) exception of the [FSIA].").

   In accordance with *Helmerich*, "state and federal courts can maintain jurisdiction to hear the merits of a[n] [FSIA expropriation exception] case only if they find that the property in which the party claims to hold rights was indeed property taken in violation of international law." 137 S. Ct. at 1316 (internal quotation marks omitted). The Eleventh Circuit further crystallized how the new standard articulated by the Supreme Court should be applied, noting that "challenges to jurisdiction under the expropriation exception, like other factual challenges to subject-matter jurisdiction under [Fed. R. Civ. P.] 12(b)(1), may be resolved by looking to 'material extrinsic from the pleadings, such as affidavits or testimony.'" *Comparelli*, 891 F.3d at 1319–20 (quoting *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th

---

[2] In *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Company*, an American oil drilling company and its Venezuelan subsidiary—which supplies oil rigs to the Venezuelan government—brought suit against the Venezuelan government and other state-run entities under the FSIA's expropriation exception, alleging that Venezuela unlawfully expropriated the subsidiary's rigs. 137 S. Ct. 1312, 1314 (2017). In its motion to dismiss, the Venezuelan government and its state-run entities argued in relevant part that the expropriation exception did not apply—and the district court lacked subject matter jurisdiction—because Venezuela's immunity as a foreign sovereign prohibited the subsidiary from bringing suit for a taking that occurred in Venezuela. In other words, the alleged expropriation constituted a domestic taking.

Cir. 2008)). Moreover, "the [plaintiff's] relevant factual allegations must make out a legally valid claim that a certain kind of right is at issue (*property* rights) and that the relevant property was taken in a certain way (in violation of international law)." *Helmerich*, 137 S. Ct. at 1316 (emphasis in original). Otherwise, a plaintiff's claims under the FSIA's expropriation exception are subject to dismissal. However, "a court normally need not resolve, as a jurisdictional matter, disputes about whether a party actually held rights in that property; those questions remain for the merits phase of the litigation." *Id*.

While *Helmerich* applies to Defendants' arguments that the Court lacks jurisdiction over Plaintiffs' FSIA expropriation exception claims against Venezuela and Pequiven, Defendants also argue in their Consolidated Motion that Plaintiffs failed to state a claim upon which relief can be granted against Defendant IPSL. (DE 297 at 22–24.) Accordingly, Rule 12(b)(6) of the Federal Rules of Civil Procedure governs this argument. Fed. R. Civ. P. 12(b)(6). A complaint survives a Rule 12(b)(6) motion to dismiss if it pleads sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All factual allegations relevant to a court's Rule 12(b)(6) inquiry are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *See Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379–80 (11th Cir. 2010). Therefore, while a plaintiff need not provide "detailed factual allegations," their complaint must offer "more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted). Further, "the [f]actual allegations must be enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

III.   **DISCUSSION**

a.   **Plaintiffs' nationalities**

A domestic taking (*i.e.*, a foreign state's taking of property from *its own nationals* and *within its own borders*) cannot qualify as an unlawful expropriation under the FSIA. *FOGADE v.*

*ENB Revocable Trust*, 263 F.3d 1274, 1320 (11th Cir. 2001). Therefore, as the Eleventh Circuit has directed, the Court must first identify C. Comparelli and J. Comparelli's respective nationalities to determine whether they may bring suit under the FSIA's expropriation exception. *Comparelli*, 891 F.3d at 1320. And "[a]s *Helmerich* made clear, . . . courts 'may take evidence and resolve factual disputes' to determine the applicability of the expropriation exception." *Id.* at 1322 (quoting *Helmerich*, 137 S. Ct. at 1316). If the Court finds that C. Comparelli and J. Comparelli are Venezuelan nationals, then Venezuela's seizure of Marivelca constitutes a domestic taking, does not implicate principles of international law, and renders the Court without jurisdiction over Plaintiffs' claims.

As the Eleventh Circuit has pointed out, this analysis presents a unique challenge when balancing the interests of nationals who are citizens of the foreign state that conducted the alleged expropriation *and* another country. Therefore, the Eleventh Circuit has developed a framework that the Court must use in evaluating whether a plaintiff is a dual national who may avail themselves of the FSIA's expropriation exception. *First*, the Court must determine whether a plaintiff is a dual national. *Id. Second*, if the plaintiff is a dual national, the Court must conduct a "fact-based inquiry . . . to determine the [plaintiff's] dominant and effective nationality." *Id.* at 1323 (internal quotation marks omitted).

In devising this second step, the Eleventh Circuit here analyzed the only two federal district court opinions to date[3]—one in the Southern District of New York and the other in the

---

[3] The Court is not aware of any other case to date where a federal district court has **determined** whether and how the FSIA's expropriation exception applies to dual nationals. The Court notes that, in *Kuo v. Government of Taiwan*, 2019 WL 120725 (S.D.N.Y. Jan. 7, 2019), a plaintiff—who may be a dual national of the United States and Taiwan—claimed that the Taiwanese government expropriated property that he inherited in Taiwan. *Id.* at *1. While the plaintiff there also sought to avail himself of the FSIA's expropriation exception, the Southern District of New York "conclude[d] that it lack[ed] subject matter jurisdiction" to hear his claim because he could not satisfy the exception's nexus requirement. *Id.* at *3. Accordingly, the court found that it "need not determine whether [the plaintiff] was a dual national of Taiwan and the United States at the time of the expropriation, or whether any such dual nationality rendered the expropriation a domestic taking (*i.e.*, not a violation of international law)." *Id.* (first citing *Comparelli v. Republica Bolivariana De Venez.*, 891 F.3d 1311, 1322–23 (11th Cir. 2018), then citing *Bahgat v. Arab Republic of Egypt*, 2015 WL 13654006, at *6 (S.D.N.Y. Mar. 31, 2015), and then citing *Wahba v. Nat'l Bank of Egypt*, 457 F. Supp. 2d 721, 731–32 (E.D. Tex. 2006)).

Eastern District of Texas—that have determined whether and how the FSIA's expropriation exception applies to dual nationals. *Id.* at 1322–24 (first citing *Bahgat v. Arab Republic of Egypt*, 2015 WL 13654006 (S.D.N.Y. Mar. 31, 2015), *aff'd on alternative grounds*, 631 F. App'x 69 (2d Cir. 2016), and then citing *Wahba v. Nat'l Bank of Egypt*, 457 F. Supp. 2d 721 (E.D. Tex. 2006)). In each case, the plaintiff—a dual national of Egypt and the United States—alleged that the Egyptian government illegally seized their property and sought redress under the FSIA's expropriation exception. *Bahgat*, 2005 WL 13654006, at *6; *Wahba*, 457 F. Supp. 2d at 731–32. The Eleventh Circuit noted that the district court in each case conducted a fact-based inquiry to determine each plaintiff's nationality, "considering matters such as the relationship between the national and the state which allegedly expropriated the property, how the national—though [their] words and conduct—characterized [themselves], and whether the state considered its national as one of its own or as a foreign national." *Comparelli*, 891 F.3d at 1323 (citing *Bahgat*, 2005 WL 13654006, at *6; *Wahba*, 457 F. Supp. 2d at 732).

The Eleventh Circuit also formulated this inquiry by relying on the Iran-U.S. Claims Tribunal's ("***Tribunal***") framework for assessing the dominant and effective nationality of dual national claimants. *Comparelli*, 891 F.3d at 1323. As a result of the yearlong Iranian hostage crisis that began in November 1979, the United States and Iranian governments created the Tribunal to, *inter alia*, "decide claims arising out of debts, contracts, expropriations[,] or other measures affecting property rights brought by United States nationals . . . against Iran and by Iranian nationals . . . against the United States . . . ."[4] In April 1984, the Tribunal issued an

---

[4] If the United States or Iran seized property or other assets from a private individual on or before January 19, 1981—the date that both nations signed the Algiers Accords and created the Tribunals—that individual could arbitrate a claim for the seized property before the Tribunal, so long as they initiated the claim by January 19, 1982. *Case No. A/18*, 1984 WL 301280, at *20, *30, *60 (Iran-U.S. Cl. Trib. Apr. 6, 1984); *see also Introduction*, Iran-U.S. Cl. Trib. [hereinafter "Iran-U.S. Cl. Trib. Website"] https://iusct.com/introduction/ (last visited Feb. 1, 2023). Many of the claimants who sought redress were dual nationals of the United States and Iran, prompting the Tribunal to issue an opinion settling how these claims should proceed. *Case No. A/18*, 1984 WL 301280, at *20–*31. Billions of dollars in claimed assets accumulated, prompting the Tribunal to preside over thousands of private claims against the Iranian government. *Id.*; *see also* Iran-U.S. Cl. Trib. Website. Accordingly, the Tribunal did not resolve all private

opinion that settled how claims should proceed, if a claimant was a dual national of both Iran and the United States. *Case No. A/18*, 1984 WL 301280 (Iran-U.S. Cl. Trib. Apr. 6, 1984). As the Eleventh Circuit explained, the Tribunal "determined that it was required by international law to consider all relevant factors to determine the dominant and effective nationality of those dual national claimants for jurisdictional purposes." *Comparelli*, 891 F.3d at 1323 (citations and internal quotation marks omitted). The Tribunal found that it held "jurisdiction over claims against Iran by dual Iran-United States nationals when the dominant and effective nationality of the claimant during the relevant period . . . were Iranian citizens under the law of Iran and United States citizens under the law of the United States." *Case No. A/18*, 1984 WL 301280, at *12. The Court now applies the Eleventh Circuit's framework to each Plaintiff.

### i.  **C. Comparelli**

It is undisputed in this case that C. Comparelli is not and has never been a Venezuelan national. The Eleventh Circuit has stated that "Carmina, according to the record, is not a Venezuelan national," and therefore, "the domestic takings rule does not appear to bar Carmina's claim."[5] 891 F.3d at 1321, 1326. The Eleventh Circuit notes that C. Comparelli's Venezuelan identification card "establishes that she is an 'Extranjer[a]'—a foreigner—and that her nationality is Italian . . . . [and that] other Venezuelan records list Italy as her birthplace and 'Resident' as her current status." *Id.* at 1321. In their briefing on Defendants' Consolidated Motion, the Parties have not disabused the Court of the Eleventh Circuit's determination. Nor does any documentary or testimonial evidence on the record contradict this understanding. In fact, Defendants acknowledge in their Consolidated Motion that C. Comparelli "was an Italian

---

claims for years and still convenes to this day to resolve pending intergovernmental disputes between the United States and Iranian governments related to these claimed assets.

[5] Although the Eleventh Circuit instructed this Court to conduct a fact-based inquiry into C. Comparelli and J. Comparelli's respective nationalities, it appears to have engaged in some analysis with respect to C. Comparelli. For example, the Eleventh Circuit stated that "it *appears* that Venezuela does not consider [Carmina] to be one of its nationals . . . . [and] *if that is the case*, the domestic takings rule does not bar Carmina's claim." *Comparelli v. Republica Bolivariana De Venez.*, 891 F.3d 1311, 1322 (11th Cir. 2018) (emphasis added).

national at all relevant times . . . ." (DE 297 at 16 n.4.) Accordingly, since C. Comparelli has always been an Italian national and has never been a Venezuelan national, the domestic takings rule does not bar her claims.

      ii.  **J. Comparelli**

          I.  **The United States and Italian Republic's treaty**

Before applying the Eleventh Circuit's two-step inquiry to J. Comparelli, the Court must first resolve two issues that Plaintiffs raised in responding to Defendants' Consolidated Motion. First, Plaintiffs' argument that the United States and Italian Republic's 1949 Treaty of Friendship, Commerce, and Navigation ("***Treaty***") precludes the domestic takings rule from barring J. Comparelli's claims is meritless. (*See* DE 300 at 9–10 (citing Treaty, Protocol, and Additional Protocol Between the United States of America and Italy Respecting Friendship, Commerce and Navigation, U.S.-It., Feb. 2, 1949, 63 Stat. 2255 [hereinafter "Treaty of Friendship"]).) The Treaty, *inter alia*, provides for an Italian national to "enjoy freedom of access" to U.S. courts and to be afforded the same rights and privileges that a U.S. national has in accessing these courts. Treaty of Friendship, 63 Stat. 2262–63.

Plaintiffs state that, "[i]n this action, Julio is seeking the protection of the courts of the United States which must be open to him as an Italian and United States citizen residing in the United States in the same way that they are to a U.S. citizen pursuant to the Treaty . . . ." (DE 300 at 9.) Plaintiffs argue that, in accordance with the Supremacy Clause of the U.S. Constitution, the Treaty "trumps the judicially created [d]omestic [t]akings [r]ule" and therefore, "the fact that Julio is also a national of Venezuela is legally irrelevant to the prosecution of his claim for a taking of property in violation of international law in the United States courts." (*Id.* at 10.) In response, Defendants state that the "[T]reaty's provisions about access to the courts have no bearing on whether the alleged seizure of [J. Comparelli]'s property in 2010 was a taking in violation of international law." (DE 302 at 5.)

The Court agrees with Defendants. When a court applies a law or rule in a manner that comports with prevailing case law, but ultimately bars a party from pursuing a claim for jurisdictional reasons, the court has not denied that party access to the U.S. courts but rather applied the relevant law, which may preclude or bar the claim. Here, J. Comparelli has enjoyed freedom of access to the U.S. courts, initiating and litigating this case before the Court for years. But his right to access this Court does not also bestow upon him a right to secure this Court's jurisdiction or a positive adjudication if the prevailing law says otherwise. Accordingly, if the Court applies the Eleventh Circuit's two-step inquiry and finds that J. Comparelli is a Venezuelan national, then the domestic takings rule bars his claims in this case.

II. **The relevant time period to consider in determining J. Comparelli's nationality**

Second, Plaintiffs' argument regarding the *relevant time period* that the Court must consider in determining J. Comparelli's nationality is also without merit. Defendants' Consolidated Motion states that the Court must determine what J. Comparelli's nationality was at the "time of the alleged expropriation," or when Defendants seized Marivelca and Trans Benz on November 23, 2010. (DE 297 at 16.) Defendants argue that, on that date, J. Comparelli was a dual national of Venezuela and Italy. (*Id.*) Plaintiffs rejoin that the relevant time period is "not applied as of the date of the expropriation," but rather based on "the entire life of the [c]laimant, from birth, and all the factors which, during this span of time, evidence the reality and sincerity of the choice of national allegiance." (DE 300 at 10 (quoting *Malek v. Islamic Republic of Iran*, 19 Iran-U.S. Cl. Trib. Rep. 48, 1988 WL 637256, at *3 (1988)).) Relying on this standard, Plaintiffs claim that the Court should treat J. Comparelli as a U.S. national. (DE 300 at 11.) And citing to three cases, Plaintiffs argue that the fact that the alleged expropriation occurred *before* J. Comparelli became a naturalized U.S. citizen does not preclude the Court from identifying him as a U.S. national. (*Id.* at 10–11.)

None of the three cases that Plaintiff rely upon support their position. Plaintiffs first cite to *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), in which the Supreme Court held that the FSIA applies to an expropriation of artwork that occurred before the Act's enactment. (DE 300 at 10.) Upon invading Austria in 1938, Nazis seized the *Altmann* plaintiff's uncle's artwork, which he bequeathed to the plaintiff in his will. 541 U.S. at 680–82. In 1948, Austrian government officials denied the plaintiff recovery of that art via deceptive and false means. *Id.* at 680, 684. After a journalist discovered this deception 50 years later, the plaintiff brought suit under the FSIA's expropriation exception. *Id.* at 680, 684. According to Plaintiffs, the *Altmann* plaintiff "was a dual citizen of Austria by birth and a naturalized U.S. citizen . . . . [who] became a U.S. citizen in 1945," after the property relevant to her case "was expropriated by the Nazis seven years earlier in 1938." (DE 300 at 10 (citing *Altmann*, 541 U.S. at 682).) However, as Defendants point out, the alleged expropriation was not the Nazis' seizure in 1938, but rather "the Austrian authorities' contested acts [that] took place in 1948." (DE 302 at 5 (citing *Altmann*, 541 U.S. at 677, 681, 683, 686 & n.7).) Therefore, contrary to Plaintiffs' assertions, the plaintiff in *Altmann* became a U.S. national *before* the alleged expropriation occurred. Furthermore, no dispute existed in *Altmann* as to whether the plaintiff was a U.S. national when she initiated her FSIA expropriation exception claim.

Plaintiffs next cite to *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993), in which the U.S. Court of Appeals for the Ninth Circuit ("**Ninth Circuit**") addressed an FSIA expropriation exception claim brought by several Argentinians. (DE 300 at 10.) Plaintiffs claim that the lead plaintiff, Susana Siderman de Blake, "was a dual citizen of Argentina by birth and a naturalized U.S. citizen." (DE 300 at 10 (citation omitted).) But as Defendants note, Susana Siderman de Blake "had been a U.S. citizen since 1967, a decade before the challenged actions [alleged expropriation] by Argentina." (DE 302 at 5 (citing *Siderman de Blake*, 965 F.2d at 703–04 (9th Cir. 1992)).) And, again, no dispute

existed in that case as to whether the lead plaintiff was a U.S. national when she initiated her FSIA expropriation exception claim.

Finally, Plaintiffs argue that since the Eleventh Circuit "borrowed" the 'dominant and effective nationality' framework from the Tribunal, the Court should adhere to the Tribunal's subsequent application of that inquiry in *Malek v. Islamic Republic of Iran*, 19 Iran-U.S. Cl. Trib. 48, 1988 WL 637256 (1988), in deciding the relevant time period to consider. (DE 300 at 10–11.)   In *Malek*, the claimant—an Iranian national who became a naturalized U.S. citizen on November 5, 1980—sought over $3 million from the Iranian government, which he claimed expropriated "his parental home and real property in Shemiran, Iran, and [his] shares in two Iranian banks." 1988 WL 637256, at *1. The Iranian government noted that the earliest the alleged expropriation could have occurred was June or July of 1979.[6] *Id.* at *1. But the Tribunal noted that "[s]ince this date is prior to the [c]laimant's alleged naturalization as a United States citizen, such a determination would also place the claim outside the Tribunal's jurisdiction." *Id.* Therefore, the Tribunal did not find that that the claimant could seek redress for an expropriation that occurred after his naturalization.

Plaintiffs have misread the Tribunal's directive in *Malek*. Indeed, the Tribunal considered factors that "evidence[d] the reality and sincerity of the [claimant's] choice of national allegiance." *Id.* at *6. However, the Tribunal did so in determining what constituted the claimant's dominant and effective nationality (*i.e.*, applying the second prong of the Eleventh Circuit's analysis). *Id.* The *relevant time period* that the Tribunal considered in ascertaining the claimant's dominant and effective nationality was still the time that the alleged expropriation occurred. *See id.* at *1 ("Since th[e] date [that the Iranian government states that the alleged expropriation occurred, June and July 1979] is prior to the Claimant's alleged naturalization as a

---

[6] The claimant originally argued that the alleged expropriation occurred on February 28, 1981—after his naturalization—although the Iranian government rightly pointed out that the Tribunal was prohibited from adjudicating claims regarding seizures that occurred after its creation on January 19, 1981. *Malek v. Islamic Republic of Iran*, 19 Iran-U.S. Cl. Trib. 48, 1988 WL 637256, at *1.

United States citizen [November 5, 1981], [this] . . . would also place the claim outside the Tribunal's jurisdiction.").

Therefore, the Court must determine what J. Comparelli's nationality was on the date—November 23, 2010—that the alleged expropriation (Defendants' seizure of Marivelca and Trans Benz) occurred.[7] And since J. Comparelli did not become a naturalized U.S. citizen until nearly eight years after the alleged expropriation, the Court will not consider him to have been a U.S. national on the date of the alleged expropriation. Even if the Court did so, all of the factors that Plaintiffs claim support his claimed U.S. nationality—"living continuously in the United States since 2011, . . . vot[ing] in U.S. national elections, [] us[ing] his U.S. passport when he travels internationally, [] ha[ving] two (2) American born children, [and] [] center[ing] [] his personal, social, and business life [] in the United States"—occurred *after* the alleged expropriation. (DE 300 at 11 (citing DE 300-1 ¶ 5).) Now that the Court has resolved these issues, it turns to the first step of the Eleventh Circuit's inquiry.

### III.  J. Comparelli's dual nationality

The Parties appear to agree, and the record confirms, that when Defendants seized Marivelca in November 2010, J. Comparelli was a dual national of Venezuela and Italy. It is undisputed that J. Comparelli was a Venezuelan national when the alleged expropriation occurred. As Defendants note, J. Comparelli testified at his deposition that he was born in "Valencia in the State of Carobobo, Venezuela." (DE 297 at 16; DE 297-4 at 13–14.) Defendants also cite to several citizenship and identification documents that recognize J. Comparelli's place of birth as Venezuela and his nationality as Venezuelan. (*See, e.g.*, DE 297-18 at 3 (copy of J. Comparelli's U.S. passport, issued on August 3, 2018, which lists his place of

---

[7] Arguably, the alleged expropriation extends beyond the specific date that Defendants seized Marivelca (November 23, 2010) to the period between 2009 and 2011, when Defendants—including Pequiven and IPSL—allegedly took actions to thwart Plaintiffs' attempts at proving that they had not stored an illegal surplus of hydrochloric acid and had only used the chemical for legal means. However, given that these actions all occurred before Julio emigrated to the United States, and that the actions that apparently support his claimed U.S. nationality (*e.g.*, voting in U.S. national elections, obtaining a U.S. passport) all occurred *after* his emigration, the Court's assessment does not change.

birth as "Venezuela"); *id.* at 6 (copy of J. Comparelli's U.S. permanent residence card, issued on February 4, 2012, which lists his country of birth as "Venezuela"); *id.* at 8 (copy of J. Comparelli's Venezuelan passport, issued on March 5, 2007 and expired as of March 4, 2012, which lists his nationality as "Venezuelan" and his place of birth as "Valencia VEN"); DE 297-19 at 6 (English translation of a Venezuelan governmental record, dated October 26, 2015, which states that J. Comparelli was issued a Venezuelan identification card in Valencia, Venezuela on October 26, 1992 and lists his place of birth as "Valencia, State of Carabobo").)

Similarly, the Parties do not dispute that J. Comparelli was also an Italian national when the alleged expropriation occurred. (*See* DE 297 at 16 (stating that J. Comparelli "was a dual Venezuelan-Italian national at the time of the alleged expropriation"); DE 300 at 9 (stating that J. Comparelli is an Italian citizen).) Record evidence also establishes J. Comparelli's Italian nationality. (*See* DE 297-18 at 7 (copy of J. Comparelli's Italian passport, issued on June 3, 2009 and expired as of June 2, 2019, listing his nationality as "Italian").) Therefore, J. Comparelli constituted a dual Venezuelan-Italian national when Defendants seized Marivelca, and the Court proceeds to the second step of the Eleventh Circuit's inquiry.

## IV. **J. Comparelli's dominant and effective nationality**

As discussed above, in determining what constitutes J. Comparelli's dominant and effective nationality, the Court must "consider[] matters such as the relationship between the national [J. Comparelli] and the state which allegedly expropriated the property [Venezuela], how the national—through his words and conduct—characterized himself, and whether the state considered its national as one of its own or as a foreign national." *Comparelli*, 891 F.3d at 1323 (citing *Wahba*, 457 F. Supp. 2d at 732; *Bahgat*, 2015 WL 13654006, at *6).

Documentary and testimonial evidence on the record before this Court establish that, during the relevant time period, J. Comparelli held himself out as a Venezuelan national *and* the Venezuelan government considered him as such. As Defendants argue, J. Comparelli characterized himself as a Venezuelan national "through his words and conduct." (DE 297 at

17.) At his deposition, J. Comparelli acknowledged that he was "born in Venezuela," "grew up and went to school and university in Venezuela," and "lived primarily in Venezuela" during the period when the alleged expropriation occurred. (*Id.* (citing DE 297-4 at 13–15, 17).) Defendants also maintain that the Venezuelan government "considered [J. Comparelli] []as one of its own[]" by: (1) categorizing him as Venezuelan on his government-issued identification card; (2) listing his nationality as Venezuelan on his government-issued passport; and (3) consistently recording his nationality as Venezuelan in the Venezuelan Commercial Registry, a government-owned and -operated database of commercial entities and their owners. (DE 297 at 17 (citations omitted); *see also* DE 297-18 (J. Comparelli's citizenship and identification documents); DE 297-20 (Plaintiffs' Venezuelan identification records); DE 297-21 at 7 (minutes and records from Marivelca's September 2007 shareholder meeting, identifying J. Comparelli as "Venezuelan"); DE 297-22 at 9 (minutes and records from Marivelca's April 2010 shareholder meeting, identifying J. Comparelli and his siblings as "Venezuelan"); DE 297-23 at 8 (minutes and records from Marivelca's December 2010 shareholder meeting, identifying J. Comparelli as "Venezuelan").)

While it is undisputed that J. Comparelli was also an Italian national during the relevant period, the Court agrees with Defendants that J. Comparelli's connections to Italy "were attenuated" during this time. (DE 297 at 18.) J. Comparelli testified during his deposition that he: (1) "had never owned land or real estate in Italy"; (2) "had never conducted any business in Italy"; (3) "had never had an Italian bank account"; and (4) "had never voted in an Italian election." (DE 297 at 18 (citing DE 297-4 at 27–28).)  And although J. Comparelli declared that he possessed an Italian passport (*see* DE 297-4 at 28), Defendants point out that he failed to "present[] [any] evidence that he ever used it when traveling or that he otherwise held himself out as an Italian citizen in his business dealings or his interactions with the Venezuelan government." (DE 297 at 18.) Notably, during his deposition, J. Comparelli "was unable to recall the number of times he had visited Italy." (*Id.*) Only after his deposition did he confirm that he

had last traveled to Italy on a cruise in 2010. (*Id.* (citations omitted); *see also* DE 297-24 at 3 (email from Plaintiffs' counsel to Defendants' counsel after J. Comparelli's deposition, disclosing his travel to Italy on a cruise).)

Plaintiffs' response makes several arguments that the Court has already rejected. First, as discussed above, the Treaty does not preclude the Court from ruling that the domestic takings rule applies, barring J. Comparelli's claims against Defendants. Second, and perhaps most fatal to Plaintiffs' claims, J. Comparelli did not argue that his dominant and effective nationality was Italian—only that it was American. Nor did Plaintiffs challenge or otherwise address Defendants' statements that between Venezuela and Italy, J. Comparelli's connections to Italy were far more attenuated. Finally, the Court has ruled that J. Comparelli was a dual national of Venezuela and Italy—not the United States—during the relevant period (*i.e.,* when the alleged expropriation occurred). Therefore, the Court need not consider Plaintiffs' argument that his dominant and effective nationality was American.

Based on the foregoing, at the time of the alleged expropriation, the Court finds that J. Comparelli's dominant and effective nationality was Venezuelan. Consequently, the domestic takings rule applies, the Court lacks jurisdiction to adjudicate J. Comparelli's claims against Defendants, and the Court must dismiss J. Comparelli's claims against each Defendant. However, given that the domestic takings rule does not bar C. Comparelli's claims, the Court proceeds to analyze whether Marivelca and Trans Benz's seizure qualifies as a taking and whether C. Comparelli's claims satisfy the remaining requirements to plead an FSIA expropriation exception claim.

> b. **The international law violation requirement**

To reiterate, a plaintiff may not avail themselves of the FSIA's expropriation exception unless they show that a defendant foreign state's taking violates international law. 28 U.S.C. § 1605(a)(3). "[T]here are three ways in which a taking may violate international law: (1) when it does not serve a public purpose; (2) when it discriminates against those who are not nationals

of the country; *or* (3) when it is not accompanied by provision for just compensation." *Comparelli*, 891 F.3d at 1326 (emphasis added) (citing *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2016). Here, Defendants argue that the Court should dismiss C. Comparelli's claims against Venezuela and Pequiven, because "Plaintiffs cannot establish that the temporary seizure of Marivelca fell into any of these categories."[8] (DE 297 at 19.)

       i.  **Public purpose**

"[T]he lack of a public purpose has been identified by both courts and the Restatement [(Third) of Foreign Relations Law] as a paradigmatic example of a taking that violates international law." *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 821 (2d Cir. 2021) (citing *Comparelli*, 891 F.3d at 1326; *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1027 (9th Cir. 2010) (en banc); *Chettri v. Nepal Bangladesh Bank, Ltd.*, 2014 WL 4354668, at *16 (S.D.N.Y. Sept. 2, 2014), *aff'd*, 834 F.3d 50 (2d Cir. 2016); *Smith Rocke Ltd. v. Republic Bolivariana de Venez.*, 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014)). In enacting the FSIA, Congress "recognize[d] immunity in cases based on a foreign state's public acts, but not in cases based on commercial private acts[.]" H.R. Rep. No. 94-1487, at 8, *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6607.

Here, Plaintiffs allege that Marivelca and Trans Benz's seizure was not motivated by a legitimate public purpose, but rather the Venezuelan government's "political agenda of monopolizing the petrochemical industry in Venezuela and desire to grant exclusive control of such industry" to Pequiven. (DE 85 ¶ 49.) Plaintiffs maintain that the Venezuelan government pursued this agenda by dispatching the Bolivarian National Guard and the Venezuela National Anti-Drug Office to conduct "warrantless" searches of Marivelca's properties in August and October 2008. (*Id.* ¶¶ 58–59.) These searches prompted the Venezuelan government to accuse

---

[8] Defendants do not advance this claim—that their seizure of Marivelca does not constitute a violation of international law—as it pertains to Defendant IPSL. Instead, Defendants argue that that the Court should dismiss Plaintiffs' claims against IPSL, because Plaintiffs have failed to state a claim against IPSL upon which relief may be granted.

Marivelca of storing amounts of hydrochloric acid in excess of legally permissible quantities. (*Id.* ¶¶ 60–61.) Plaintiffs claim this allegation is "wholly without merit based on Marivelca's documentation." (*Id.*) Plaintiffs do not dispute that they maintained quantities of hydrochloric acid in excess of what the law permits, but rather claim that their "surplus of only 410 kilograms" operated "within the normal tolerance margins associated with the weighing of the product purchased in bulk and its subsequent packaging for storage at Marivelca's warehouse." (*Id.* ¶ 73.) Plaintiffs further allege that, as a result of these "warrantless" searches, the Venezuelan government "directly through PEQUIVEN, the Bolivarian National Guard, the Public Ministry, the [Venezuela National Anti-Drug Office], the Supreme Court and lower courts, and the Prosecutor General's Office expropriated Marivelca pursuant to a baseless and sham criminal proceeding . . . in violation of Venezuelan law . . . ." (*Id.* ¶ 49.)

In their Consolidated Motion, Defendants argue that "after jurisdictional discovery, Plaintiffs are unable to carry their burden to establish that the[se] criminal proceedings conducted by Venezuelan authorities were a sham and a pretext" for pursuing a political agenda of monopolizing the Venezuelan petrochemical industry. (DE 297 at 20.) Defendants argue that Plaintiffs have failed to "identify [any] evidence of corruption or ulterior motive . . . . [or any] violation of Venezuelan law or procedural irregularity." (*Id.* at 20–21.) Specifically, Defendants maintain that Plaintiffs have pleaded "generalized criticisms" of Venezuela's judiciary system—branding the criminal proceedings against C. Comparelli a "sham"—but have not otherwise produced "specific evidence of impropriety" underlying these proceedings. (*Id.*) Defendants point out that, when C. Comparelli was asked "whether she [knew] of any evidence of bribery, corruption, or misconduct on the part of the judges assigned to her case," she only referred to "a video of a speech in which then-Venezuelan President Hugo Chavez referred to the court-ordered seizure of four chemical companies and their transfer to Pequiven." (*Id.* at 21 (quoting DE 297-3 at 93).)

Defendants assert that "[n]othing in the record" supports Plaintiffs' allegations that Marivelca stored regular quantities of hydrochloric acid that did not warrant criminal charges, and that the warrantless searches conducted by Venezuelan authorities were illegal. (DE 297 at 22.) Defendants aver that Marivelca "operated in a highly regulated industry—the storage and distribution of controlled substances—in which routine inspections and audits are common, as [C. Comparelli] . . . acknowledged" during her deposition testimony. (*Id.* at 21 (citing DE 297-3 at 42–43).) Defendants also argue that "warrants are 'not necessary' [under Venezuela law] for [] authorities to conduct inspections of establishments that store, transport, or distribute controlled substances." (DE 297 at 21 (citing DE 297-6 at 9–11).) Finally, Defendants dispute the accuracy of Plaintiffs' claims in the Amended Complaint that courts in Costa Rica "found . . . that the criminal proceeding [against C. Comparelli] is a farce and a Machiavellian deployment of judicial terrorism." (*Id.* (quoting DE 85 ¶ 102).)

The Court agrees with Defendants that Plaintiffs have failed to elicit documentary and testimonial evidence sufficient to establish that Marivelca and Trans Benz's seizure lacked a public purpose. First, since the inception of this litigation, Defendants have identified a legitimate reason for Marivelca's November 2010 seizure: the company's storage of hydrochloric acid in excess of legally-permissible amounts. (DE 297 at 11.) Courts regularly review this country's jurisprudence regarding takings, in assessing whether a foreign government's seizure of property constitutes an expropriation. *See, e.g.*, *Devengoechea*, 889 F.3d at 1228 (citations omitted) ("Similar to the concept embodied in our Fifth Amendment to the U.S. Constitution, FSIA expropriation involves sovereign 'takings' of property, without just compensation."); *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 168 (D.D.C. 2016) (citations omitted) (stating in an FSIA expropriation exception case that "it is plausible that no international law violation has occurred until the plaintiff has sought compensation in a domestic forum," in part because this rule mirrors prevailing Fifth Amendment takings law in this country); *Simon v. Republic of Hungary*, 812 F.3d 127, 148 (D.C. Cir. 2016) (citing a "rule applicable to domestic

claims asserting a taking of property without just compensation" to ascertain whether a foreign government's taking of property without payment constitutes an expropriation under the FSIA), *abrogated on other grounds sub nom. Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021); Restatement (Third) of Foreign Relations Law § 712 rpt. n.6 ("[T]he line in international law is similar to that drawn in United States jurisprudence for purposes of the Fifth and Fourteenth Amendments to the Constitution in determining whether there has been a taking requiring compensation."). And it is well established in this country that the government is "not [] required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Bennis*, 516 U.S. at 452 (citations omitted). Moreover, the FSIA's expropriation exception was not intended to hold foreign governments responsible "for loss of property or for other economic disadvantage [to a plaintiff] resulting from bona fide general taxation, regulation, forfeiture for crime, or other action of that kind that is commonly accepted as within the police power of states[] . . . ." Restatement (Third) of Foreign Relations Law § 712 cmt. g. Therefore, Venezuela and Pequiven's seizure of Marivelca is "entitled to a presumption of regularity, rebuttable only with 'clear or specific evidence' of impropriety." (DE 297 at 20–21 (quoting *PNC Fin. Servs. Grp., Inc. v. C.I.R.*, 503 F.3d 119, 123 (D.C. Cir. 2007).) Plaintiffs have failed to elicit such evidence.

The Parties cite to conflicting reports about the quantities of hydrochloric acid that Marivelca maintained during the relevant period, but the Court need not resolve factual disputes as to which report most accurately reflects Marivelca's actual inventory of hydrochloric acid or whether Marivelca maintained surplus amounts within "normal tolerance margins," as Plaintiffs suggest. Answering these questions would exceed the appropriate inquiry necessary to determine whether Marivelca and Trans Benz's seizure advanced a public purpose, and instead would operate to review the prosecutorial decisions and sovereignty of a foreign state. The remainder of Plaintiffs' argument that Marivelca and Trans Benz's seizure does not advance a public purpose relies on "generalized criticisms of the Venezuelan judiciary"—by way of

references to various human rights reports—that cannot be used to substantiate allegations that Venezuela initiated a "sham" criminal proceeding against C. Comparelli for political reasons. (DE 302 at 7; *see also* DE 300 at 5 (in which Plaintiffs state that "there is an overwhelming universe of materials" that establish that the Venezuelan judicial system is "partial and corrupt")).)

Further, Plaintiffs have failed to accurately characterize the "rulings of Costa Rican courts" or explain why they are relevant to the public purpose analysis. The Amended Complaint states that an appellate court in Costa Rica "reviewed the unfounded allegations concerning the criminal proceeding that was launched by the Venezuelan Government against Plaintiffs [and] basically found[] . . . that the criminal proceeding is a farce and a Machiavellian deployment of judicial terrorism." (DE 85 ¶ 102; *see also* DE 300 at 13 (stating that the appellate court "found that the criminal proceeding was a sham")).) But as Defendants state, the recitation of what the Costa Rican court "basically found" neither quotes the actual decision nor summarizes it accurately. Indeed, that court's review concerned a collateral matter regarding an extradition request sent by Venezuela to Costa Rica regarding Freddy Comparelli (*see* DE 297-26), who has not been a party to this suit since March 2016—long before Plaintiffs filed the Amended Complaint. (DE 1; DE 53.) After a trial court in Costa Rica granted Venezuela's extradition request, Freddy appealed and the appellate court ruled that "the facts for which F's [Freddy's] extradition was granted were not duly substantiated by the trial court." (DE 297-26 at 10.) The appellate court was concerned with the nature of the crimes Venezuela accused Freddy of committing, but that issue is not relevant to the Court's decision in this case.

Finally, Plaintiffs incorrectly—and without further explanation—argue that their allegations regarding a lack of public purpose must be construed "as true . . . at this stage of the litigation." (DE 300 at 14.) But, as discussed, *Helmerich* heightened the standard that Plaintiffs must satisfy for C. Comparelli's expropriation claim to survive dismissal and Plaintiffs have failed

to elicit specific evidence of impropriety to substantiate their claim of a lack of public purpose underlying Marivelca and Trans Benz's seizure.

ii.  <strong>Discriminatory motive</strong>

A plaintiff may also establish that a foreign state's taking violates international law, if a discriminatory or arbitrary purpose motivated the taking. A discriminatory taking "implies unreasonable distinction, and so [t]akings that invidiously single out property of persons of a particular nationality would be [discriminatory], whereas classifications, even if based on nationality, that are rationally related to the state's security or economic policies might not be [discriminatory] and thus not in violation of international law." *Helmerich & Payne Intern. Drilling Co.*, 784 F.3d 804, 813 (D.C. Cir. 2015) (alterations and internal quotation marks omitted) (quoting Restatement (Third) of Foreign Relations Law § 712 cmt. f (1987)), *vacated and remanded on other grounds*, 137 S. Ct. at 1312; *see also Comparelli*, 891 F.3d at 1327 (citing the same passage). Congress, in enacting the FSIA's expropriation exception, identified a discriminatory taking as one that is "arbitrary or discriminatory in nature." H.R. Rep. No. 94-1487, at 19–20, *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6618.

In their Consolidated Motion, Defendants argue that no arbitrary or discriminatory motive underlies the expropriation alleged and that Plaintiffs have acknowledged this during their respective testimonies. Defendants emphasize that C. Comparelli "testified [during her deposition] that she does not believe that the Venezuelan government persecuted her because of her nationality[] . . . or out of political animus." (DE 297 at 19 (citing DE 297-3 at 31, 94).) Specifically, Defendants note that C. Comparelli responded "[n]o," when asked whether she believed that she had "experienced persecution at the hands of the Venezuelan government because of [her] nationality[.]" (DE 297-3 at 94; *see also* DE 297-4 at 58 (in which J. Comparelli responded "[n]o" when asked whether he "ha[d] any evidence that Trans Benz was taken because of [his] Italian nationality").) Defendants also note that C. Comparelli was asked

whether she was "involved in any political activity" while serving as Marivelca's president, to which she also answered "[n]o." (DE 297-3 at 31.)

Plaintiffs do not allege in the Amended Complaint that Defendants discriminated against C. Comparelli because of her Italian nationality. The Amended Complaint does, however, claim that Marivelca and Trans Benz's seizure "was the product of a discriminatory political persecution" and describe the criminal proceeding initiated against Plaintiffs as "irregular, arbitrary, and illegal." (DE 85 ¶¶ 107, 109; *see also* DE 300 at 14 (arguing that Defendants' seizure of Marivelca was "arbitrary").) In support of this claim, Plaintiffs refer to the December 2019 letter written by María Faría—the Venezuelan ambassador to Costa Rica appointed by Juan Guaidó[9]—to Costa Rican government officials ("***December 2019 Letter***"), stating that her office "ha[s] information[] that . . . the Venezuelan legal system was used to persecute [C. Comparelli] for political reasons . . . ." (DE 300-6 at 2.) According to Plaintiffs, the December 2019 Letter demonstrates that the Venezuelan government's decision to seize Marivelca and subsequently initiate criminal proceedings (including an extradition request) against C. Comparelli was arbitrary. Plaintiffs aver that "[t]he Court should give great weight to [the

---

[9] On January 23, 2019, Juan Guaidó declared himself Venezuela's interim president. *See* Daniella Cheslow et al., *Venezuelan Opposition Leader Guaidó Declares Himself President, With U.S. Backing*, NPR (Jan. 23, 2019 12:42 PM), https://www.npr.org/2019/01/23/687643405/anti-maduro-protesters-march-in-cities-across-venezuela. On the same day, the United States officially recognized Guaidó as Venezuela's interim president. *See* Presidential Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela, 2019 WL 290127 (Jan. 23, 2019). Accordingly, on January 29, 2019, when Guaidó appointed María Faría to serve as Venezuela's ambassador to Costa Rica, the United States recognized him as Venezuela's interim president. @jguaido, Twitter (Jan. 29, 2019 12:45 PM), https://twitter.com/jguaido/status/1090304950301806592; *Guaidó-appointed ambassador takes possession of Venezuelan embassy in Costa Rica*, Tico Times (Feb. 21, 2019), https://www.ticotimes.net/2019/02/21/guaido-appointed-ambassador-takes-possession-of-venezuelan-embassy-in-costa-rica.

However, it is unclear as of the date of this Order whether the United States still recognizes Guaidó as Venezuela's interim president. *See Washington coy on Venezuela's Guaido, still recognizes 2015 National Assembly*, Reuters (Jan. 4, 2023 8:05 PM), https://www.reuters.com/world/americas/us-continues-recognize-venezuelas-2015-national-assembly-interim-president-white-2023-01-04/; Dave Lawler, *U.S. no longer recognizes Guaidó as Venezuela's president, Biden official confirms*, Axios (Jan. 4, 2023), https://www.axios.com/2023/01/04/us-stops-recognizing-juan-guaido-venezuela; Sareen Habeshian, *Venezuelan opposition removes interim leader Juan Guaidó*, Axios (Dec. 30, 2022), https://www.axios.com/2022/12/31/venezuela-interim-leader-juan-guaido

December 2019 Letter, which constitutes an] admission by a party-opponent, especially because the admission comes from agents of [] Guaidó's administration." (DE 300 at 15.)

Defendants replied by attaching a more recent June 2021 letter penned by Faría ("***June 2021 Letter***"), which was prepared "to transmit a correction and clarification on certain aspects of letter EMBAVENEZCR-DE-2019-163 [the December 2019 Letter] . . . ." (DE 302-1 at 3.) The June 2021 Letter repudiates Faría's prior statements about the criminal proceedings against C. Comparelli in Venezuela, declaring that her office "ha[s] no specific information in [their] possession indicating that the criminal proceedings . . . were motivated by political issues, or were irregular." (*Id.* at 3.) It also appears from the June 2021 Letter that Venezuela had withdrawn its extradition request for C. Comparelli and that "there was no warrant of arrest against [C. Comparelli] by judicial authorities in Venezuela, and that there has been no INTERPOL red alert against her since 2016." (*Id.* at 4.) According to Defendants, the June 2021 Letter shows that Venezuela's decision to withdraw an extradition request for C. Comparelli "was based not on any conclusion that the criminal proceedings had an improper *motive*, but rather on the Embassy's determination that there was no current warrant of arrest against" C. Comparelli. (DE 302 at 6 (citing DE 302-1 at 1–2).)

Based on the foregoing, the Court finds that Plaintiffs have failed to plead that a discriminatory and/or arbitrary motive against C. Comparelli underlies the alleged expropriation in this case. First, as discussed, Plaintiffs have not alleged that Venezuela and Pequiven seized Marivelca because of C. Comparelli's Italian nationality or any other, unreasonable distinction. Second, Plaintiffs have not sufficiently pleaded that Venezuela or Pequiven arbitrarily targeted C. Comparelli in seizing Marivelca. Plaintiffs' citation to one letter—amongst a record spanning thousands of pages after months of jurisdictional discovery and years of litigation—does not persuade this Court that a discriminatory or arbitrary motive led to Marivelca and Trans Benz's seizure. Moreover, not only was the December 2019 Letter penned by a government official who was neither involved in Marivelca and Trans Benz's seizure nor Venezuela's subsequent

initiation of criminal proceedings against C. Comparelli, it was later repudiated by the official herself in a subsequent letter.

### iii. **Just compensation**

The Amended Complaint alleges that Defendants seized Marivelca, without "fair[ly], adequate[ly], [or] prompt[ly]" compensating Plaintiffs. (DE 85 ¶ 9.) However, the Court has already found that Plaintiffs failed to meet the evidentiary burden required by *Helmerich* to support their allegations that Venezuela and Pequiven seized Marivelca, and initiated criminal proceedings against Plaintiffs, as part of a politically motivated scheme. Therefore, the Court cannot find at this juncture that Venezuela or Pequiven have any obligation to justly compensate Plaintiffs for seizing Marivelca. Given that Plaintiffs have failed to establish that Marivelca and Trans Benz's seizure lacks a public purpose or was executed because of a discriminatory or arbitrary motive, C. Comparelli cannot establish that Venezuela and Pequiven's seizure of Marivelca constitutes a taking in violation of international law and the Court must dismiss her claims against both Venezuela and Marivelca.[10]

### c. **Plaintiffs' claims against IPSL**

Finally, Defendants' Consolidated Motion requests that the Court dismiss Plaintiffs' claims against IPSL, because Plaintiffs "have failed to plead facts that would sustain a cause of action against it." (DE 297 at 27.) Defendants argue that Plaintiffs have not alleged anywhere "and there is no evidence to suggest" that IPSL "expropriated any property, nor even that IPSL is (or was ever) in possession of any property belonging to Plaintiffs." (*Id.*) Defendants contend that IPSL's affiliation with Pequiven—as its "alter ego" used as a "conduit" for Pequiven's commercial activities outside of Venezuela, including in the United States—is insufficient to "identif[y] any action on the part of IPSL that would give rise to an expropriation claim." (*Id.*

---

[10] Since Plaintiffs cannot show that Marivelca's seizure constitutes a taking in violation of international law, and that showing is required for Carmina to proceed with her FSIA expropriation exception claim, the Court need not analyze whether Carmina has satisfied her burden under the exception's remaining requirements: statutory nexus and exhaustion of available remedies. *See* 28 U.S.C. § 1605(a)(3).

(quoting DE 85 ¶¶ 5, 11).) In response, Plaintiffs contend that *Helmerich*'s heightened pleading standard does not apply to IPSL, because it "is not an agency or instrumentality of Venezuela, and consequently, there is no presumption of sovereign immunity against [IPSL] for [] Plaintiffs to rebut." (DE 300 at 20.) Plaintiffs also claim that they have "adequately pled the alter ego theory of liability against IPSL . . . . produc[ing] enough evidence to back up their alter ego allegations . . . ." (*Id.* at 22.) Defendants reply that, irrespective of whether IPSL is an alter ego of Pequiven, Plaintiffs still have not pleaded "[any] facts suggesting that IPSL participated *in any way* in the alleged taking or that IPSL *ever* took *any* action of *any* kind relating to Plaintiffs." (*Id.*)

Having reviewed the Amended Complaint, the Court does not find that Plaintiffs have advanced sufficient factual allegations to establish that IPSL was involved in Marivelca or Trans Benz's seizure or subsequent criminal proceedings against C. Comparelli. Outside of identifying IPSL as Pequiven's alter ego, the Amended Complaint fails to state with any specificity how IPSL was involved in any of the politically motivated schemes that Plaintiffs attribute to Venezuela and Pequiven in this case. Therefore, under both Fed. R. Civ. P. 12(b)(6) and *Helmerich*'s heightened pleading standard, Plaintiffs have failed to state a claim upon which relief can be granted against IPSL—irrespective of whether this entity constitutes an agency or instrumentality of the Venezuelan government. Accordingly, the Court must also dismiss C. Comparelli's claims against IPSL.

IV.    **CONCLUSION**

As discussed, J. Comparelli's dominant and effective nationality is Venezuelan, precluding him from pursuing his FSIA expropriation exception claim against Defendants. And while C. Comparelli's Italian nationality does not preclude her claim, Plaintiffs have failed to establish under *Helmerich*'s heightened pleading standard that Marivelca and Trans Benz's seizure constitutes a taking in violation of international law. Further, Plaintiffs' threadbare allegations against IPSL fail to state a claim upon which relief can be granted, irrespective of

how IPSL is organized and regardless of which pleading standard applies. Therefore, dismissal is warranted.

A district court may dismiss a case with prejudice after a plaintiff has been afforded the opportunity to amend their initial complaint. *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016). Dismissal with prejudice may also be warranted if any subsequent amendments would be "futile," *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319–20 (11th Cir. 1999), or would cause "undue prejudice to the defendants." *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1287 (11th Cir. 2003) (quoting *Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000)). Here, the Court has already afforded Plaintiffs an opportunity to amend their Initial Complaint. (*See* DE 85.) Moreover, the Court has also determined that J. Comparelli's Venezuelan nationality precludes his expropriation exception claim. Therefore, allowing him a subsequent amendment would be futile. Allowing C. Comparelli to file a second amended complaint would also cause undue prejudice to Defendants, prolonging litigation that has involved extensive jurisdictional discovery over the course of several years. Dismissal *with* prejudice is thus appropriate.

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Consolidated Motion (DE 297) is **GRANTED**.

2. Plaintiffs' claims against Defendants are **DISMISSED WITH PREJUDICE**.

3. Any other pending motions are **DENIED AS MOOT**.

4. Any forthcoming deadlines, hearings, and/or trial settings are **CANCELED**.

5. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers in Miami, Florida on this <u>3rd</u> day of February, 2023.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE